MOORE (McIVER v.). See Case No. 8,831.

MOORE (MAYOR & COMMONALTY v.). See Case No. 9,359.

MOORE (MEISTER v.). See Case No. 9.398.

MOORE (MILLER v.). See Case No. 9,584.

## Case No. 9,770.

### MOORE v. MITCHELL.

[2 Woods, 483.] [1]

Circuit Court, S. D. Alabama. Dec. Term, 1874.[2]

TRUSTS — SEPARATE ACCOUNT BY TRUSTEE — PAYMENTS RECEIVED IN CONFEDERATE MONEY — UNDERSTANDING WITH TESTATOR CREATING TRUST.

1. A trustee who keeps no separate account of the trust fund, but mixes it with his own money, renders himself liable to account for it in case of loss.

2. A trustee having received the trust funds in good money, and loaned them out, afterwards received in repayment of the loan at par, Confederate treasury notes which were worth only thirty cents on the dollar, and which afterwards became worthless in his hands. Held, that he was not entitled to a credit for the amount unless he could show that he received the depreciated paper upon actual compulsion.

3. The trustee could not, under these circumstances, save himself from liability to account for the trust fund by offering to show that there was a parol understanding between the testator, from whose estate the trust fund came, and himself, whereby he agreed to manage the business of the trust with the same care as his own, and to make no charge for his services as trustee.

4. Where there is a prayer for general relief, a court of equity may afford such relief as the averments of the bill and the proofs warrant, although the complainant may not be entitled to the relief specifically prayed for.

In equity. Heard for final decree on the pleadings and evidence. The facts were as follows: By the last will and testament of James Mitchell, deceased, late of Sumpter county, Alabama, which was executed on September 29, 1855, the defendant, Daniel Mitchell, was made trustee for the complainant, Catharine Moore. There were devised to him in trust for said Catharine two slaves which he was authorized to hire or sell, and he was directed to pay to her during the lifetime of her husband either the hire or the interest of the money obtained from a sale of the slaves. The defendant was also entrusted by the will with the distributive share of the complainant in the testator's estate, and directed to pay her the interest thereon during the lifetime of the husband. On the death of her husband, the defendant was directed to pay to complainant the corpus of the trust fund committed to his hands by the provisions of the will. In February, 1856, the defendant, as authorized by the will, sold the slaves and obtained therefor $1,375. On Au-

gust 31, 1857, the defendant received the distributive share of complainant in the estate of James Mitchell, amounting to $1,150. The defendant loaned out the trust fund on interest. He testified in regard to its management as follows: "I kept no separate account of the trust funds after they came into my hands; I accounted for the annual interest to the agent of complainant, and was ready to pay over the principal in the event of the death of complainant's husband, which was the time fixed by the will for me to pay her the corpus of the estate. I thought that was all I was required to do, and therefore kept no separate and distinct account of the trust fund, and cannot give the dates of the loans and other particulars inquired about. All the trust funds were put together and treated in the same way, and when necessary, I put some of my own funds with the trust funds to make out the sum a borrower might want. I kept no separate account of the trust fund and cannot furnish any." The last loan of the trust funds was made by defendant to one Simmons Harrison. To the trust funds the defendant added about $1,500 of his own money, making the loan about $4,000. In March, 1863, the representatives of the estate of Harrison, the borrower, tendered defendant in payment of the debt Confederate treasury notes, which were at that time worth at the rate of three and a half dollars for one of gold. The defendant accepted the notes in payment. He did not invest them in property of any kind, nor loan them again, but as he says, retained them till the close of the war. He has never rendered, or offered to render, any account of his trust, nor does he produce or has he ever exhibited to complainant the Confederate treasury notes which he says he received from Harrison's estate in payment.

The purpose and prayer of the complainant's bill was that the trust created by the will of the late James Mitchell in her favor might be established, and an account taken of what was due complainant by reason thereof; that the trustee might be removed and decreed to pay to complainant whatever might be found due to her on account of said trust, and that she might have such other and further relief as it may appear to the court she was entitled to. The defendant claimed by way of defense that by a verbal understanding with his father, the testator, had just before his death, he undertook to manage the trust as he managed his own business, and without any compensation; that he did so manage the trust estate; that he was compelled to receive Confederate money for the trust funds loaned to one Simmons Harrison; that at the same time, he received the same kind of currency for a debt due to himself from the estate of Harrison; that having received such funds, he found it impossible to invest them or loan them, and they became worthless on his hands as a consequence of the late war. The proof to sus-

[1] [Reported by Hon. William B. Woods, Circuit Judge, and here reprinted by permission.]

[2] [Affirmed in 95 U. S. 587.]

tain the defense, that the Confederate treasury notes were received in payment of the debt due the trust estate by compulsion, consisted of the depositions of the defendant himself and of James M. Winston and Jonathan Bliss. On this point the defendant testified: "If I had refused to receive the Confederate money for a debt of any kind, I would have incurred the strong condemnation of my neighbors and friends, and would have been looked upon as a disloyal and suspicious character, and might have been subject to serious annoyance and injury in my person and property. To have refused to receive this money from the representative of a Confederate soldier, killed in battle, would have subjected me to the additional odium of trying to make money out of the widow and orphans of a dead soldier, and of using my money to oppress them. The bare suspicion of such an attempt on my part would have brought down on me the contempt of every one, and could not have been done without risk of personal injury." James M. Winston testified that in 1863, Confederate currency was the only money in circulation in Alabama; "but I do not know," he says, "that the money was imposed on the people by irresistible force by the late Confederate government. Said currency was made current as dollars in the county of Sumpter, where defendant resided, by the irresistible force of public opinion. If a creditor had refused Confederate money when tendered, he would have been subject to great reproach and denunciation; but I cannot say how far it might have been carried. It would have been regarded as a stab at the Confederacy, and as disloyalty to it and to the independence of the Confederate States." Jonathan Bliss testified: "I cannot say that Confederate currency was ever imposed upon the people of Alabama by irresistible force of the Confederate government directly applied. The force compelling the circulation of Confederate money was a compound one, made up in part of the action and influence of the Confederate government, its officers and friends, in part by the action and influence of the state government and officers, in part by the necessities of life, and largely by the public voice and demand; and by the further fact that there were in some places combinations of men acting as committees of vigilance, claiming to supervise and deal with obnoxious individuals considered disloyal to the Confederate cause. In 1863, a refusal of Confederate money would have subjected the party to much reproach and indignity, and unless he was fortified by strong personal position, to degrees of violence and outrage." On cross examination, this witness testified in answer to the question whether he knew any persons who refused to take trust money in Confederate notes and were not mobbed or murdered: "I refused to take it in such cases as long as I could, but finally felt constrained to yield as to interest, and in some cases when I thought there was dan-

ger of the debtor becoming insolvent, as to the principal."

R. H. Smith and R. I. Smith, for complainant.

William Boyles and G. Y. Overall, for defendant.

WOODS, Circuit Judge. The complainant bases her claim for relief substantially on two grounds: 1. That the defendant did not keep the trust estate separate from his own, but mingled it with his own money, and thereby made himself the debtor of complainant and liable to pay absolutely the trust money with interest. 2. That the defendant was not justified in receiving Confederate money worth less than thirty cents on the dollar, and then retaining that without investment until it became entirely worthless.

As to the first ground, it is obvious to remark that the evidence of the defendant himself shows that he treated the trust fund as his own, and mingled it with his own. He kept no account and could render no account. He cannot state at what rate of interest the trust money was loaned, and with the exception of Simmons Harrison, he does not name any person to whom it was loaned. When the loan was returned to him in Confederate money by the representatives of Harrison, he makes no pretense of keeping the funds separate from his own. In fact they had before that time been mingled with his own, so as to be indistinguishable. It seems evident from defendant's own testimony that he thought he would discharge his trust by paying over to complainant the interest yearly, and then upon the death of her husband, paying over to her the principal. He therefore kept no account of the trust funds, but mixed and loaned them with his own. It does not appear that he ever took a note payable to himself as trustee, or that the evidences of debt received by him for the loan of trust funds had any ear mark by which to distinguish them from his own. In fact he states distinctly that he mixed his own funds with the trust funds, in making his loans. A trustee is not permitted to so treat the trust property. When he does so, he becomes debtor to the trust, and if there is a loss, it is his loss and not the loss of the trust estate.

It has been held that where the subject of a trust is money, the trustee, in making a deposit of it in the bank, should be careful to do it to the account of the trust estate and not to his own account; for should he deposit it to his own account, he would render himself liable for it on the failure of the bank. Wren v. Kirton, 11 Ves. 377; In re Stafford, 11 Barb. 353; McAllister v. Com., 30 Pa. St. 536. If the trustee deposits the trust funds in his own name, he thus mixes them with his own private funds which always renders him liable in case of loss. Lupton v. White, 15 Ves. 432; Chedworth v. Edwards, 8 Ves. 46; Duke of Leeds v. Earl of Amherst, 20 Beav. 239; Fellows v. Mitchell, 1 P. Wms.

81; Trustees of Auburn Seminary v. Kellogg, 16 N. Y. 83; Spear v. Tinkham, 2 Barb. Ch. 211; Stanley's Appeal, 8 Pa. St. 431.

2. But suppose the defendant had kept the trust funds distinct from his own, that he had loaned them separately and taken evidence of debt to show that the money loaned belonged to the trust, was he justified under the circumstances detailed in the evidence in receiving repayment of the loan in Confederate notes? When Harrison's representatives paid up the money borrowed by their intestate in March, 1863, Confederate notes were worth less than thirty cents on the dollar, according to the statement of the answer. According to the same authority, it was impossible to invest them in any permanent or valuable property. A trustee who lends good money and receives it back in such a pretense for a currency ought to be able to show good reason for so doing. No stress of public opinion, no odium or unpopularity arising from a refusal to take such currency would justify him in thus dissipating the trust estate. Nothing but compulsion would justify a trustee in such a course. Horn v. Lockhart, 17 Wall. [84 U. S.] 581.

There was no law of the Confederate States obliging the defendant to receive Confederate treasury notes. They were not even made a legal tender. No law of the state of Alabama compelled the defendant to receive such currency. And the testimony fails to satisfy me that a trustee, refusing to receive funds of the trust estate in such a depreciated currency, would have been subjected to any injury of person or property, and nothing short of such compulsion would have justified the trustee in thus administering the trust estate.

The defendant claims, however, that by a verbal understanding with his father, the testator, he agreed to receive no compensation for his discharge of the duties of the trust, and that he was to manage the business of the trust with the same care as he did his own, and that having done that, he is discharged from liability, notwithstanding the loss. In reply to this, it is sufficient to say that the trust is created by will, and cannot be modified by verbal understanding had between the trustee and the testator. Nor does the fact that the trustee agreed to manage the trust without compensation relieve him from the consequences of his mismanagement. Under the will by which the trust was created, the defendant was entitled to compensation. He cannot relieve himself from liability for mismanagement by now saying that he did not charge or expect compensation.

Finally, it is insisted that under the will by which the trust is created, the trust money was to be kept in the hands of the trustee until the death of the husband of the complainant, and then paid over to complainant, that the bill prays, among other things, that the trust fund be paid over to complainant, her said husband being still in life; that this prayer is contrary to the terms of the trust,

and ought not to be granted, and that no other relief than that prayed for can be administered, even though there is a prayer for general relief. I cannot yield assent to this proposition. "The usual course is for the plaintiff, in this part of his bill, to make a special prayer for the particular relief to which he thinks himself entitled, and then to conclude with a prayer of general relief at the discretion of the court. The latter can never be properly or safely omitted, because if the plaintiff should mistake the relief to which he is entitled in his special prayer, the court may yet afford him the relief to which he has a right under the prayer of general relief, provided it is such relief as is agreeable to the case made by the bill." Story, Eq. Pl. § 40, and cases there cited.

My conclusion is, therefore, that there should be a decree for complainant, establishing the trust, removing the trustee, and decreeing him to pay over the trust fund with interest, to a suitable person to be appointed trustee in his stead, and referring the cause to a master to ascertain and report the amount of the trust fund, including the interest, which has not been already paid by the trustee.

[The defendant appealed to the supreme court, where the decree of the circuit court was affirmed. 95 U. S. 587.]