UNITED STATES v. BONNESS et al.

(Circuit Court of Appeals, Eighth Circuit. September 7, 1903.)

No. 1,839.

1. UNITED STATES—CONTRACT FOR SALE OF LOGS—SELECTION OF TREES BY GOVERNMENT AGENT.

Where the United States, through its agents, selected logging superintendents, who were intrusted with supervision of the cutting of timber on an Indian reservation, and the duty of determining the particular trees which came within the definition of "dead and down timber," which duty required the exercise of judgment and discretion, and such judgment and discretion were honestly exercised, the government is bound thereby, and cannot charge one to whom it contracted to sell the logs after they should be cut and banked with liability beyond the contract price, on the ground that some of the logs which were cut and banked, and which the purchaser took possession of under his contract, were cut from living green trees.

In Error to the Circuit Court of the United States for the District of Minnesota.

Charles C. Houpt, U. S. Atty.

A. Y. Merrill and R. J. Powell, for defendants in error.

Before SANBORN and VAN DEVANTER, Circuit Judges, and SHIRAS, District Judge.

SHIRAS, District Judge. The questions at issue in this case before the trial court grew out of certain contracts relative to the cutting of dead timber on the Chippewa Indian Reservation, in the state of Minnesota.

Under date of January 23, 1901, a written agreement was entered into "by and between Captain W. A. Mercer, Seventh Cavalry, acting U. S. Indian agent, Leech Lake Agency, for and on behalf of the Chippewa Indians, party of the first part, and Lee West, of Bena, Minn., party of the second part," whereby the party of the first part agreed to sell to the party of the second part, under the rules and regulations prescribed by the Secretary of the Interior, December 21, 1900, the merchantable dead timber, standing or fallen, cut from certain named sections and parts thereof forming part of the Chippewa Indian Reservation, the logs to be banked at Portage Lake and

Leech river, unless some other place or places should be mutually agreed upon, payment therefor at the rate of $6.50 per thousand feet for the white pine, and $5.50 per thousand feet for Norway pine, to be made before the removal of the logs, and not later than April 15, 1901. It will be noticed that under the terms of this contract the purchaser of the timber, Lee West, had nothing to do with the cutting of the timber, that matter being left under the control of Captain Mercer under the rules approved by the Secretary of the Interior under date of December 21, 1900, a copy of which was attached to the contract between Captain Mercer and Lee West, and expressly made part thereof, in which rules it is provided that the acting Indian agent should have supervision of the logging, with power to appoint foremen for the logging camps, and scalers to measure the logs when cut; it being further provided that the agent might place in charge of logging districts, the limits to be defined by the agent, three logging superintendents, whose duty it would be to supervise all logging operations within their districts.

It further appears that on January 4, 1901, Captain Mercer, as acting Indian agent, for and on behalf of the Chippewa Indians entered into a written contract with one William Douglass for the cutting, hauling, and banking of the dead pine timber suitable for sawlogs, standing, lying, or being on certain named quarter sections of land, forming part of the Indian reservation, and on the 23d of January, 1901, a similar contract was entered into between Captain Mercer and one Henry B. Sherer for the cutting and banking the dead pine timber on other named sections and parts thereof of the reservation. The timber to be thus cut and banked by Douglass and Sherer was the timber agreed to be taken and paid for by Lee West under the contract entered into by him with Captain Mercer.

A large quantity of timber was cut by Douglass and Sherer and banked as required by their contracts, which was taken possession of by Lee West and Frederick W. Bonness, who were, as copartners, engaged in the lumber business, and to whose benefit the contract entered into by Lee West with Captain Mercer inured, and who paid for or tendered payment for the logs so taken at the price named in the contract of purchase.

On behalf of the United States a claim was asserted that in the cutting of the timber by Douglass and Sherer these parties had cut some 398,400 feet of white pine and 83,560 feet of Norway pine from live trees, and which did not come within the description of dead and down timber, and as the logs coming from such live or green trees had been taken possession of by the defendants, West and Bonness, it was an unlawful conversion thereof by the defendants, as under the contract of purchase they were only entitled to the timber cut from the dead and down trees found upon the sections and parts thereof included within the contract of January 23, 1901. Based upon this claim, this action was brought in the name of the United States against West and Bonness in the Circuit Court for the district of Minnesota, and at the March term, 1902, the case was tried before a jury, the verdict being in favor of the defendants.

Upon the face of the record it appears that two ultimate proposi-

tions of fact were submitted to the jury: (1) Were there any live or green trees cut and delivered to the defendants? which proposition included the definition of the term "dead and down timber" as used in the contract; (2) if so, what was the quantity and value thereof? which would call for the rule to be followed in measuring and ascertaining the quantity of timber in the trees wrongfully cut.

If upon the first proposition it was found by the jury that in fact live or green trees, not coming within the fair definition of dead or down timber, had been cut by either Douglass or Sherer, and had been taken possession of by the defendants, then the legal question would arise whether the latter would be responsible for the actual value thereof.

Upon the legal proposition the court instructed the jury that "the cutting of living trees suitable for lumber upon Indian reservations is contrary to law, and the purchaser of logs cut from such living trees from the person who wrongfully cut them does not acquire title to them, as the trespasser could have no title to convey"; and further, that, "if you find from the evidence that living green trees were so unlawfully cut in violation of the act of Congress and banked by Douglass and Sherer on Portage Lake and the Mississippi river, and that such living green trees were received by the defendants or either of them, then the plaintiffs are entitled to a verdict for the value of such living green trees at the place where they were banked, and from which they were taken by defendants. * * *"

These instructions, to which no exceptions were taken, and which were certainly as favorable to the government as could be reasonably asked, narrowed the issue of the liability of the defendants down to the one question of fact, to wit: Did the timber cut by Douglass and Sherer and taken by the defendants include any living green trees, not coming within the term "dead and down timber," as used in the act of Congress, which provided for the cutting of such timber upon the Indian reservation? The definition of "dead and down timber" given by the court to the jury, was, in substance, that adopted by this court in the case of United States v. Pine River Logging Co., 89 Fed. 907, 32 C. C. A. 406, and no exception is now urged thereto.

It thus appears that the issue of fact whether any trees other than those coming within the terms "dead and down" had been cut was sent to the jury with a proper definition of the meaning of the term, and with respect to this issue it is said in the brief of counsel for the United States: "The issue submitted to the jury was not the amount of timber cut and removed, but the kind. The evidence is so conflicting that the jury might properly have returned a verdict for either party, but, having found for the defendants, their determination must remain undisturbed, unless the charge of the court contains reversible error."

Much time was taken in the trial before the jury in the introduction of evidence upon the methods followed in scaling the logs cut, and exceptions were taken to some rulings of the court upon matters connected with this question; but it is apparent that we are not called upon to consider any errors assigned except those that bear upon the one question of fact, to wit, the kind of trees that were cut and taken

into possession by the defendants.   Upon this issue the jury found, in substance, that the logs taken by the defendants did not include any wrongfully cut from living green trees, and therefore the question of the rule to be followed in ascertaining the quantity of green trees wrongfully cut was not reached or considered by the jury.   The only error assigned which bears upon the issue upon which the verdict of the jury was based is the sixth, and is in the words following:

"(6) There was also error in this:  That the court, as a portion of the general charge, charged the jury as follows:  'Now, gentlemen, I think it obvious that when these contracts were made it was not the intention of any of the parties that a determination as to what timber came under the classification of dead and down timber should necessarily be decided by a lawsuit and by a jury. I do not believe either of the parties had that in their minds.  In the nature of things, this was a matter that must be determined by somebody, and by men going into the woods, as to what trees they should cut or should properly be cut.  Whom was that to be determined by?  Necessarily it must be determined by the men who are intrusted to do the cutting and to look after the cutting, and those men were all selected by the government.  The question must be determined by men intrusted with the cutting of the trees; it could not be otherwise.  It could not practically be otherwise.  I say it was intrusted to the loggers under the supervision of the logging superintendents, whose duty it was to go from time to time to the different camps to see to it that these men used proper judgment and discretion with reference to cutting the trees.  The contract devolved the discretion especially upon them. It was a matter of discretion, and in the nature of things it must be so.  A logger seeing an injured tree, and presumably having some knowledge of the matter, would examine to determine in his own mind what that injury was —whether it was serious, and what its effect would be;  whether the tree was so injured that it ought to be cut, or whether the injury was so slight and trifling that the tree would still grow and thrive, and that it ought to be allowed to stand.  Whomever under the contract was given that discretion was the proper one to exercise it, and, if he exercised it honestly and faithfully, then that ought to be the end of the matter.  No person should come in afterwards, after the trees had been cut under the exercise of the discretion of the man to whom the power to exercise that discretion was given as to cutting the timber, and by any fanciful theory with reference to certain views that he might imagine ought to be taken of the matter upset what had been done.  Business cannot be transacted in that way.  It is obvious to you, gentlemen, that such must be the case.' "

In determining whether the court erred in this portion of its charge, the nature of the case and of the issues embraced therein must be kept in mind.   It is not charged that the defendants had any connection with or control over the cutting of the timber.   It is not charged that the defendants connived with any one else in any scheme to secure the cutting of logs from living trees.

The theory of the government was that if in fact living green trees were cut by Douglass or Sherer, which passed into the possession of the defendants, the latter would be liable for the value thereof, and the court instructed the jury that such was the law of the case.   The court, however, further instructed the jury, in effect, that as the defendants had nothing to do with the cutting of the timber, and as the evidence showed that such cutting was done under the supervision of persons appointed by the government, and as the determination of what particular trees could be lawfully cut was a matter for the exercise of judgment and discretion, the government would be bound by the conclusion reached by the persons to whom the cutting of the tim-

ber had been intrusted, so long as such judgment and discretion were honestly exercised. In so ruling the trial court substantially followed the doctrine laid down by this court in the already cited case of United States v. Pine River Logging Co., wherein it was said:

"The first of these instructions might be upheld if the court intended to say, and was understood as saying, that the government was not entitled to recover for timber cut and removed from the reservation in those instances where, as the result of honest mistakes of judgment on the part of the logging superintendent which were committed while he was giving due attention to the performance of his official duties, certain injured trees were classified as dead timber, and removed, which in fact ought not to have been so classified. If thus understood, the instruction was substantially correct. The determination of what timber was 'dead timber,' in the eye of the statute, as that phrase has heretofore been defined, involved the exercise of judgment and discretion on the part of the logging superintendent; and, as he had been appointed to decide such questions, his decisions thereon, if made in good faith, after the exercise of due diligence to advise himself concerning the character of the timber which was being cut and delivered, ought to be regarded as binding upon the government. Elliott v. Railway Co., 40 U. S. App. 61, 21 C. C. A. 3, 74 Fed. 707; Lewis v. Railway Co. (C. C.) 49 Fed. 708; Wood v. Railroad Co. (C. C.) 39 Fed. 52, and cases there cited."

Counsel for the government contend that the trial court erred in the instructions excepted to, for that "it is the settled law of this court that the government cannot be estopped or barred of any of its rights for the laches or negligence of its servants"—citing in support of this contention the case of United States v. Winona & St. Paul Ry. Co., 67 Fed. 969, 15 C. C. A. 117.

The declaration made in that case, that "the United States is not bound by any statute of limitations, nor barred by any laches or negligence of its officers in a suit to enforce the rights or to protect the interests vested in it as a sovereign government," cannot be questioned when the facts call for the application of the principle thus stated; but this rule is not the one to be applied in cases like the one at bar.

The question in this case is whether the United States is to be held bound by the action of persons to whom it had intrusted the supervision of the cutting of logs on the Indian reservation, in determining the particular trees that came within the definition of "dead and down timber," it being admitted that such action involved the exercise of judgment and discretion, and that such discretion had been honestly exercised by the agents of the government. It is not sought to bind the government by the laches, negligence, or dishonesty of its agents, but by the results of the action of its agents acting within the scope of the authority conferred upon them, upon a matter of fact requiring the exercise of knowledge and discretion, and in a case wherein it is not shown that the agents acted dishonestly or with any purpose to defraud the government. Carried to its legitimate result the contention of counsel would necessitate the holding that the government cannot be bound in any case by the action of its agents, no matter how faithfully and honestly the duty imposed upon them may have been performed.

In Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106, a question arose as to the effect of an order issued by a quartermaster of the

United States fixing the distances that were to govern in estimating the payment to be made to Kihlberg for the transportation of army supplies under a contract which provided that payment was to be made according to the distance ascertained and fixed by the chief quartermaster of the district of New Mexico. In passing upon the force to be given to the action of the quartermaster in fixing the distances, it was said by the Supreme Court:

"There is neither allegation nor proof of fraud or bad faith upon his part. The difference between his estimate of distances and the distances by air line, or by the road usually traveled, is not so material as to justify the inference that he did not exercise the authority given him with an honest purpose to carry out the real intention of the parties, as collected from their agreement. His action cannot, therefore, be subjected to the revisory power of the courts without doing violence to the plain words of the contract. Indeed, it is not at all certain that the government would have given its assent to any contract which did not confer upon one of its officers the authority in question. If the contract had not provided distinctly, and in advance of any services performed under it, for the ascertainment of distances upon which transportation was to be paid, disputes might have constantly arisen between the contractor and the government, resulting in vexatious and expensive, and to the contractor oftentimes ruinous, litigation. Hence the provision we have been considering. Be this supposition as it may, it is sufficient that the parties expressly agreed that distances should be ascertained and fixed by the chief quartermaster, and in the absence of fraud or such gross mistake as would necessarily imply bad faith, or a failure to exercise an honest judgment, his action in the premises is conclusive upon the appellant as well as upon the government."

The ruling in the case cited was approved and applied by the Supreme Court in United States v. Gleason, 175 U. S. 588, 20 Sup. Ct. 228, 44 L. Ed. 284; the rule being recognized that, in the absence of fraud or of mistake or negligence so gross as to justify the inference of bad faith, a court is not justified in setting aside the decision or action, upon a question demanding the exercise of judgment and discretion, of a person to whom, by the understanding of the contracting parties, the matter is intrusted for decision or control, and this rule was enforced, in the two cases just cited, in controversies to which the government was a party.

In the case at bar the trial court clearly and repeatedly instructed the jury that Douglass and Sherer had no right to cut living green trees, and if logs of that character were cut and taken into possession by the defendants the latter could get no title thereto, and were liable to the government for the value thereof. It being the fact, however, that, in carrying out the cutting of the dead and down timber, the question would constantly arise whether a given tree or trees came under the classification of dead and down timber—a question which must be decided and the decision acted upon while the loggers were at work—the court instructed the jury that the decision was "intrusted to the loggers under the supervision of the logging superintendents, whose duty it was to go from time to time to the different camps to see to it that these men used proper judgment and discretion with reference to cutting the trees. The contract devolved the discretion especially upon them. It was a matter of discretion, and, in the nature of things, it must be so. * * * Whomever under the con-

tract was given that discretion was the proper one to exercise it, and, if he exercised it honestly and faithfully, then that ought to be the end of the matter." These instructions to the jury are fully sustained by the rule recognized by the Supreme Court and by this court in the cases cited, and the exception thereto is without merit.

The jury having found on this issue that no living green trees had been wrongfully cut, as already stated, the errors assigned on the rulings of the court with respect to the proper mode of measuring the trees become wholly immaterial, and need not be considered by us. Upon the pivotal point in the case, and upon which the jury found for the defendants, we find no error in the rulings of the trial court, and its judgment must therefore be affirmed.