LEWIS PUB. CO. V. WYMAN.

---

LEWIS PUB. CO. v. WYMAN et al.†

(Circuit Court of Appeals, Eighth Circuit. August 20, 1910.)

No. 3,038.

1. APPEAL AND ERROR (§ 843*)—MOOT QUESTIONS.

Where, pending suit to enjoin a postmaster from depriving complainant of the right to send its publication through the mails as second-class matter, complainant made another application for entry, which was granted, and complainant ever since had enjoyed the privilege, whether

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
† Rehearing denied November 7, 1910.

the Postmaster General, in determining that complainant was not previously entitled to second-class rates, erroneously proceeded on the assumption that the case was one of original application for entry of the publication as second-class matter, instead of one concerning an entry previously accorded, and erroneously annulled complainant's right without a hearing, became moot questions which would not be reviewed on appeal from a decree denying an injunction and dismissing the bill.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 3331; Dec. Dig. § 843.*]

2. DISMISSAL AND NONSUIT (§ 53*)—BILL—CHANGE OF CIRCUMSTANCES—DISMISSAL.

When the element of controversy disappears from a case by change of circumstances or by act of the parties, the case will be dismissed, though complainant claims that he yielded to the stress of the situation.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Cent. Dig. § 107; Dec. Dig. § 53.*]

3. POST OFFICE (§ 15*)—SECOND-CLASS MATTER—REGULATIONS—POSTMASTER GENERAL—AUTHORITY.

Rev. St. § 161 (U. S. Comp. St. 1901, p. 80), conferring on the head of the Post Office Department authority to prescribe regulations not inconsistent with the law for the performance of its business, the Postmaster General was authorized to limit the number of sample copies a publisher who was entitled to mail his publication at second-class rates might send out under those rates to an amount equal to that of the publisher's legitimate subscriptions; the publisher not being entitled under Act Cong. March 3, 1885, c. 342, 23 Stat. 387 (U. S. Comp. St. 1901, p. 2669), prescribing a one cent per pound second-class rate, "including sample copies," to mail an unlimited number of sample copies at that rate.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. § 15.*]

4. POST OFFICE (§ 15*)—MAIL MATTER—SECOND-CLASS RATES—"PRIMARILY."

The word "primarily," as used in Act Cong. March 3, 1879, c. 180, § 14, 20 Stat. 359 (U. S. Comp. St. 1901, p. 2647), excluding from the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates, means "chiefly," or "principally."

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. § 15.*

For other definitions, see Words and Phrases, vol. 6, p. 5550.]

5. POST OFFICE (§ 15*)—RATES—SECOND-CLASS MATTER.

Postal Laws, §§ 436, 456, and Regulations 1992, authorized the imposition of higher postage rates on sample copies sent out by a publisher entitled to second-class rates in excess of the number of sample copies he is entitled to mail at second-class rates under his permit.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 22; Dec. Dig. § 15.*]

6. EQUITY (§ 41*)—EQUITY JURISDICTION—LEGAL QUESTIONS.

Complainant sued a local postmaster and assistant postmaster to enjoin them from depriving it of the right to send its publication through the mails as second-class matter. During the existence of the controversy complainant paid under protest $20,650 alleged excess postage, and also gave bond for the payment of other sums. Held, that complainant's right, if any, to recover the excess payments and relief against the bond, was enforceable at law either by an action to recover the payments, or by a defense to an action on the bond, and hence, it being determined that complainant was not entitled to an injunction, the case could not

be retained to determine such questions, but would be dismissed without prejudice.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 116–118; Dec. Dig. § 41.*]

Sanborn, Circuit Judge, dissenting.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Suit by the Lewis Publishing Company against Frank Wyman and another. Judgment for defendants (168 Fed. 752), and complainant appeals. Remanded for modification, and affirmed.

This suit was begun March 18, 1907, by the Lewis Publishing Company, the publisher of the Woman's Magazine, against Frank Wyman and James L. Stice, respectively the postmaster and assistant postmaster at St. Louis, Mo., to enjoin them from depriving it of the right to send its publication through the mails as second-class matter at the postage rate of one cent per pound. The bill of complaint contains a prayer that the court ascertain and adjudge the amount of complainant's subscription list for the months from September, 1905, to March, 1907, and that defendants be perpetually enjoined from interfering with its enjoyment of the second-class mail privilege according to the extent and limits thereof as ascertained and decreed by the court. There was also a prayer for general relief. An application for a temporary injunction was denied, and upon final hearing the bill of complaint was dismissed. The complainant appealed.

Shepard Barclay (Carter, Collins & Jones, P. H. Cullen, and Thomas T. Fauntleroy, on the brief), for appellant.

Truman Post Young, Asst. U. S. Atty. (Henry W. Blodgett, U. S. Atty., on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges, and AMIDON, District Judge.

HOOK, Circuit Judge (after stating the facts as above). The principal contention on this appeal is that the Woman's Magazine, a monthly publication the subscription price of which was 10 cents a year, had been fully accorded the right to transmission through the mails as second-class matter at the pound rate of postage, and the Postmaster General annulled it without the hearing provided by law. Act March 3, 1901, c. 851, 31 Stat. 1107 (U. S. Comp. St. 1901, p. 2655). The decision of the Postmaster General proceeded upon the assumption that the case was one of an original application for entry of the publication as second-class matter instead of one concerning an entry previously accorded. But whatever the true situation in this respect may have been and whether a legal hearing was had are questions that need not now be determined. After the order complained of was made by the Postmaster General, and while this suit was pending in the Circuit Court, complainant made another application for entry, and upon compliance with certain requirements of the department it was granted. Complainant has ever since enjoyed the privilege. Manifestly, therefore, whether it had been previously accorded, and, if so, whether it was annulled without a hearing, are moot questions. The functions of a judicial tribunal do not extend to the declaration of abstract principles of law or the determination of ques-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

tions of fact not involved in actual controversy. When the element of controversy disappears from a case through a change of circumstances or by the act of the parties, the case will be dismissed. It is no answer for a party to say he yielded to the stress of the situation. American Book Co. v. Kansas, 193 U. S. 49, 24 Sup. Ct. 397, 48 L. Ed. 613; Mills v. Green, 159 U. S. 651, 16 Sup. Ct. 132, 40 L. Ed. 293. Complaint is made, however, that the right finally accorded complainant is not all it was entitled to under the law. In admitting the publication to entry at the second-class rate the department limited the sample copies that might be so transmitted through the mails to a number equal to that of the legitimate subscribers. It is contended that when a publisher has once been accorded the second-class privilege there is, as long as he retains it, no limit to the number of sample copies he can send through the mails at the pound rate. This contention is based on the language of the act of March 3, 1885, which prescribes a postage rate of one cent per pound or fraction thereof for publications of the second class "including sample copies." Act March 3, 1885, c. 342, 23 Stat. 387 (U. S. Comp. St. 1901, p. 2669). The act does not specifically place a limit on the number of sample copies, and it is claimed the department can therefore impose none. The words "including sample copies" were also in Act March 3, 1879, c. 180, § 11, 20 Stat. 359. We think that under the authority conferred by Congress (Rev. St. § 161 [U. S. Comp. St. 1901, p. 80]) upon the head of the department to prescribe regulations not inconsistent with law for the performance of its business, the Postmaster General may lawfully impose such a limitation. The act of Congress does not purport to grant an unlimited privilege as to sample copies, and its very generality and indefiniteness invites a supplementary regulation. It is not necessary to the validity of a departmental regulation that specific statutory authority for it be discovered. It would be impracticable to set forth in the statutes all the rules for the conduct of the business of the great executive departments of the government, and Congress has wisely confined itself to marking general outlines and imposing general limitations, leaving the subordinate and supplemental details suggested by practical experience to be prescribed by the heads of the departments. A departmental regulation must not be inconsistent with the statutes, but it may be by way of execution or supplement.

There is another consideration which bears upon the limitation of the number of sample copies that may be mailed at the second-class pound rate. Section 14 of the act of March 3, 1879, excludes from the second-class rate "regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates." In the sense of the statute, "primarily" means "chiefly or principally." The second-class pound rate of postage was intended for newspapers and periodicals published for the dissemination of information of a public character or devoted to literature, the sciences, arts, or some special industry and circulated for the most part among bona fide subscribers, and not for publications designed principally for advertising purposes or for free circulation or circulation at nominal rates. Obviously the number of copies distributed gratuitously has a direct bearing upon the primary or chief design of the publication,

whether really for subscribers at a substantial or compensatory price, or, on the other hand, at a nominal price and for advertising purposes.

It is also contended that, though a general postal regulation has been prescribed making an excess of sample copies evidence that the publication is primarily designed for advertising, etc., there is none authorizing the imposition of a higher postage rate on such excess while the entry as second-class matter remains in force, unrevoked. We think, however, the authority denied by complainant is deducible from sections 436 and 456 of the Postal Laws and Regulations of 1902. See, also, section 338, Postal Guide Dec. 1, 1905, p. 1041, and Circular 25, at page 1045.

Our attention is directed to various amendments of the regulations affecting mail matter of the second class promulgated December 4, 1907, and effective January 1, 1908; the latter date being subsequent to the entry finally accorded complainant's publication. These amendments are not directed specially at complainant, but affect all publications of that class in the country, and it would be foreign to our province to attempt a general judicial examination of them to define for the future the status of complainant's magazine and its rights. The courts do not sit in general review of the actions of the executive departments, but await the occurrence of some concrete controversy and its presentation according to the settled rules of pleading and practice.

During the existence of the controversy, complainant paid under protest $20,650 for postage in excess of the amount calculated at the second-class pound rate, and also gave bonds for the payment of other sums. It is now contended that this suit should proceed for the recovery of the excess payments from the defendants and for the disposition of the bonds that were given. As already stated, the defendants were respectively the postmaster and assistant postmaster at St. Louis, Mo. The acts of Congress make it the duty of a postmaster to deposit all postage receipts at his office in the Treasury of the United States and a neglect to do so an offense. Rev. St. §§ 407, 4051, 4053, 4054 (U. S. Comp. St. 1901, pp. 228, 2754, 2755). There are some qualifications of this, but they do not affect the point presently to be mentioned. Act March 3, 1905, c. 1480, § 2, 33 Stat. 1091 (U. S. Comp. St. Supp. 1909, p. 1024), provides that whenever "it is shown to the satisfaction of the Postmaster General" that postage has been collected in excess of the lawful rate, "he may in his discretion" authorize the postmaster to refund the amount out of postal receipts in his hands. It would be an interesting question whether the doctrine of Cary v. Curtis, 3 How. 236, 11 L. Ed. 576, applies, and an action would lie against the defendants under the circumstances shown in the record. See, also, Curtis' Adm'r v. Fiedler, 67 U. S. 461, 17 L. Ed. 273; Collector v. Hubbard, 12 Wall. 1, 20 L. Ed. 272; Philadelphia v. Collector, 5 Wall. 720, 18 L. Ed. 614. It should be observed in this connection that Teal v. Felton, 12 How. 284, 13 L. Ed. 990, was an action in trover for wrongfully detaining a copy of a newspaper, not an action to recover postage claimed to be excessive, but which the law required the postmaster to deposit where it was no longer under his control. Again, the amounts claimed by complainant as excess payments are withheld according to

the decision of the department as to the number of legitimate subscribers to complainant's publication and the number of sample copies complainant was entitled to mail at the pound rate. The question suggests itself whether this decision of the department is one of fact or of mixed law and fact and, therefore, within Bates & Guild Co. v. Payne, 194 U. S. 106, 109, 24 Sup. Ct. 595, 597 (48 L. Ed. 894), where it was said:

> "The rule upon this subject may be summarized as follows: That where the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive; and that even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they may have the power, and will occasionally exercise the right of so doing."

But these questions need not be determined. If complainant has a cause of action for the excess payments made under protest it is clearly a legal one; and adequate relief against the bonds given by complainant is obtainable by defense when action is brought on them by the government. There is nothing of an equitable character in the cause of action or the defense. True, when involved in a suit of which a court of equity has jurisdiction, matters of legal cognizance may be disposed of if incidental to the equitable relief that is granted. But it appears here that at the instance of complainant the case it had in court assumed such a phase that no injunction or other equitable relief could be granted. It is as though complainant had amended its bill by withdrawing all averments calling for the interposition of a court of equity. Under such circumstances a court should not retain the case for purposes purely legal. In Mitchell v. Dowell, 105 U. S. 430, 26 L. Ed. 1142, the court said:

> "The rule is that where a cause of action cognizable at law is entertained in equity on the ground of some equitable relief sought by the bill, which it turns out cannot, for defect of proof or other reason, be granted, the court is without jurisdiction to proceed further, and should dismiss the bill without prejudice."

See, also, Kramer v. Cohn, 119 U. S. 355, 7 Sup. Ct. 277, 30 L. Ed. 439; Lewis Pub. Co. v. Wyman (C. C.) 168 Fed. 756; Cumberland Building & Loan Ass'n v. Sparks (C. C.) 106 Fed. 101. There is a qualification of the rule in patent cases where complainant is entitled to an injunction when the suit is begun but the patent expires before final decree. It is held in such cases there may nevertheless be an accounting for damages and profits. Carnegie Steel Co. v. Colorado Fuel & Iron Co., 91 C. C. A. 229, 165 Fed. 195. But the general rule is as above stated.

It is suggested that ground of equity jurisdiction will be found in the necessity for an accounting as to an alleged excess of postage exacted by the government. Passing the question whether mere volume of items in the claim of a party and the difficulty of proving them makes a complexity or intricacy of accounts for cognizance in equity (United States v. Bitter Root Co., 200 U. S. 451, 26 Sup. Ct. 318, 50 L. Ed. 550), it is clear this suit was for an injunction, not for an accounting except as the latter might be an incident to the awarding of

an injunction. There was no prayer for an accounting. The prayer for general relief means relief agreeable to the case made in the bill. Lewis Pub. Co. v. Wyman (C. C.) 168 Fed. 756, which was a case involving another publication of complainant, is in point. In this connection, we note the statement in defendant's brief that other cases are pending in which the complainant here is seeking to recover the postage paid under protest and also cases in which the government claims postage still due on excesssive mailings.

The dismissal of complainant's bill should, however, have been without prejudice to its rights at law in respect of the excess payments of postage and the bonds.

The cause is remanded to the Circuit Court for a modification of the decree accordingly, and, as so modified, the decree is affirmed.

SANBORN, Circuit Judge (dissenting). I find myself unable to concur in the opinion of the majority that this has become a moot case or that the complainant has a remedy at law so prompt and efficient as to bar relief in equity. The admissions of the defendants and the evidence in this case have convinced me that the Woman's Magazine was admitted to transmission in the mails as second-class matter in October, 1902, that from that time forward the complainant was entitled, under the repeated rulings of the officers of the Postal Department and under the statutes and the regulations applicable to that department, to the transmission of sample copies of the Woman's Magazine equal in number to the copies sent to legitimate subscribers, and that these copies of the magazine were transmitted as second-class matter with the knowledge, consent, and approval of the officers of the Post Office Department under their admission of October, 1902, until March 4, 1907. Those officers and the government for whom they were authorized to act in this matter were estopped by these acts from denying that this magazine was entitled to the benefits of transmission as second-class matter at the pound rate of postage. Judson v. United States, 120 Fed. 637, 643, 57 C. C. A. 99; Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; United States v. Bonness, 125 Fed. 485, 489, 60 C. C. A. 321; State of Michigan v. Jackson, L. & S. R. Co., 69 Fed. 116, 123, 16 C. C. A. 345; United States v. Willamette Valley & C. M. Wagon-Road Co. (C. C.) 54 Fed. 807, 811; Lytle v. State of Arkansas, 9 How. 314, 332, 13 L. Ed. 153; Wirth v. Branson, 98 U. S. 118, 121, 25 L. Ed. 86; Harrison v. Lewis, 27 Ark. 152, 154.

Act March 3, 1901, c. 851, 31 Stat. 1107, provides that:

"When any publication has been accorded second-class mail privileges the same shall not be suspended or annulled until a hearing shall be granted to the parties interested."

A reasonable notice to the parties interested that the question whether or not a second-class mail privilege shall be suspended or annulled will be heard, of the charges on which the demand for suspension or annulment is founded, and of the time and place of the hearing, together with a presentation to the parties interested of all of the evidence in support of the charges and a reasonable opportunity there-

after to present at the hearing evidence and argument in opposition to this evidence, are indispensable elements of the notice and hearing required by this statute. In re Wood & Henderson, 210 U. S. 246, 254, 28 Sup. Ct. 621, 52 L. Ed. 1046; In re Rosser, 101 Fed. 562, 567, 41 C. C. A. 497; Michigan Trust Co. v. Ferry, 175 Fed. 667, 678, 99 C. C. A. 221.

On March 4, 1907, without any notice of any hearing upon the question of the suspension or annulment of the second-class mail privilege which the complainant's publication had been admitted to enjoy, after a hearing at which the officer of the Postal Department in charge thereof informed the complainant that the only question then to be heard was whether or not the legitimate subscriptions to the Woman's Magazine exceeded 539,901, and at which hearing he expressly denied the request of the complainant to see or to hear and to know the evidence against it upon the charge that was on hearing and at which this officer and the department withheld from the complainant all knowledge of this evidence, the officers of the Post Office Department suspended and annulled the second-class privilege that had been accorded to the Woman's Magazine and refused to accept any copies of it for mailing at the second-class pound rate of postage. This order of the department was in my opinion beyond its powers and void because it was made without the notice and without the hearing which conditioned the jurisdiction of the officers of that department to make it. At that time the Woman's Magazine had more than 850,000 legitimate subscribers, and the complainant was entitled under repeated rulings of the Post Office Department and under the law to send through the mails as second-class matter as many sample copies as it had legitimate subscribers, or 1,680,000 copies in all. The illegal order of the department prevented the complainant from sending any of these copies through the mails at the second-class rate in the months of April, May, June, July, August, September, October, and November and, after December 17, 1907, prevented it from sending more than 686,682 copies.

On March 18, 1907, the complainant exhibited its bill, which set forth the facts which have been recited and the further fact that the defendants unlawfully had restricted the number of copies of the Woman's Magazine entitled to transmission at the second-class pound rate between April, 1906, and March, 1907, to 539,308, and had unlawfully required the complainant to deposit, and it had deposited with the defendants under protest, $17,150 to secure the payment of the unlawful amounts demanded by them for postage in excess of the second-class pound rate on copies of the magazine which the complainant was entitled to send at that rate. The complainant prayed for a preliminary injunction against the enforcement by the defendants of the order of March 4, 1907, excluding the Woman's Magazine from transmission through the mails at the second-class pound rate, that the number of its legitimate subscribers from September, 1905, to March, 1907, be ascertained and adjudged by the court, and for general relief. The record discloses the fact that the defendants compelled the complainant to deposit $20,650 for postage in excess of the second-class pound rate and compelled it to give bonds for the payment of other large

sums, and it now asks that the amount owing by it on account of these claims be adjudicated, that the balance above the amount thus owing be returned to it, and that the bonds be canceled by decree of the court.

On April 18, 1907, the court below denied the motion of the complainant for a preliminary injunction upon the erroneous ground that the Woman's Magazine had never been admitted to the privileges of the second-class pound rate of postage, and at the final hearing it rendered a decree for the defendants from which the complainant has taken this appeal. Under the pleadings and the facts which the record thus presents, the complainant was entitled in my opinion to the preliminary injunction for which it prayed in 1907, and at the final hearing to an adjudication of the number of copies of the magazine entitled to transmission at the second-class pound rate from September, 1905, to the commencement of this suit, to an accounting of the amount due on account of the claims for postage for which the deposit of $20,650 was made, to a decree for the return of the balance of that deposit above the amount which was justly due on account of this claim of excess postage, and to a decree of avoidance of the bonds which it had been compelled to give.

The objection that there is no specific prayer in the bill for this accounting, for the determination of the amount due to the complainant on account of these deposits, and for the cancellation of its bonds, does not seem to me to be either substantial or tenable. Both the pleadings and the evidence presented facts which entitle the complainant to this relief. No objection to the prayer of the bill was made in the demurrer. It is the settled rule and practice in equity to grant under the general prayer any relief to which the facts set forth in the bill entitle the complainant, although he is not entitled to the specific relief for which he prays. Watts v. Waddle, 6 Pet. 389, 402, 8 L. Ed. 437; Sage v. Central R. R. Co., 99 U. S. 334, 25 L. Ed. 394; London & San Francisco Bank v. Dexter Horton & Co., 61 C. C. A. 515, 528, 126 Fed. 593, 606; Moore v. Mitchell, 17 Fed. Cas. 692, 694. By so much the more may such a court grant under the general prayer relief to which the facts pleaded entitle the party when he is also entitled to the specific relief he prays. Wilson v. Plutus Mining Company, 174 Fed. 317, 320, 98 C. C. A. 189. "There is nothing in the intricacy of equity pleading," says the Supreme Court, "that prevents the plaintiff from obtaining the relief under the general prayer, to which he may be entitled upon the facts plainly stated in the bill. There is no reason for denying his right to relief, if the plaintiff is otherwise entitled to it, simply because it is asked under the prayer for general relief and upon a somewhat different theory from that which is advanced under one of the special prayers." Lockhart v. Leeds, 195 U. S. 427, 436, 437, 25 Sup. Ct. 76, 79, 49 L. Ed. 263.

The evidence in this record and the admissions of the defendants in their pleadings in my opinion render the defendants liable at law and also in equity for the amount of these deposits in excess of the postage justly due on account of the claims made by the defendants. To my mind the facts they present lead unavoidably to the conclusion that these moneys and bonds were extorted from the complainant with-

out lawful authority and leave the defendants without justification. While they may be liable at law, equity has concurrent jurisdiction with the law in all cases where a long and complicated account composed of numerous items is in controversy. And it is an established and familiar rule of equity jurisprudence that the power is conferred and the duty imposed upon a court of equity which has jurisdiction to grant some equitable relief, to exercise its power to determine the entire controversy relative to the subject-matter between the parties in all its branches. The court below undoubtedly had plenary jurisdiction, and it was its duty to issue the preliminary injunction in 1907. It had complete authority and it was its duty to take and adjudicate the accounting between the parties which conditioned their rights to the $20,650, which had been deposited with the defendants by the complainant under protest, and on either ground it seems to me there was ample jurisdiction in equity to determine the entire controversy.

That the right to an injunction at the time when the bill is filed will sustain the grant of full relief, although at the final hearing of the case the right to the injunction has expired by lapse of time, is well settled, not only in patent cases (Busch v. Jones, 184 U. S. 598, 22 Sup. Ct. 511, 46 L. Ed. 707; Clark v. Wooster, 119 U. S. 322, 325, 7 Sup. Ct. 217, 30 L. Ed. 392; United States Mitis Co. v. Detroit Steel & Spring Co., 122 Fed. 863, 866, 59 C. C. A. 589; New York Sugar Co. v. Peoria Sugar Co. [C. C.] 21 Fed. 878; Chinnock v. Paterson P. & S. Tel. Co. [C. C.] 110 Fed. 199; Davenport v. Rylands, L. R. 1 Eq. 302), but also in suits in equity in which infringements of patents are not involved (People v. Chicago, 53 Ill. 424, 428; Peoria v. Johnston, 56 Ill. 45; Spears v. New York, 87 N. Y. 359, 376; Dulaney v. Scudder, 94 Fed. 6, 36 C. C. A. 52; Patterson v. Barber Asphalt Pav. Co., 94 Minn. 39, 43, 101 N. W. 1064, 102 N. W. 176; Tayloe v. Merchants' Fire Ins. Co., 50 U. S. 390, 405, 13 L. Ed. 187).

Again, the determination of the portion of the $20,650 which the complainant is entitled to recover from the defendants involves a long and complicated account consisting of millions of items. For every copy of the magazine in excess of the 539,308 copies which the government admitted the complainant was entitled to transmit prior to March, 1907, may furnish a material item of this account. While an action at law may undoubtedly be maintained for the amount to which the complainant is entitled here, a court of equity has concurrent jurisdiction of this accounting. And such a court with its deliberate methods, its power to select men of training and experience in work of this nature, its authority to consider and modify their reports after exceptions and hearings, is alone competent to take fairly and to adjudicate justly the balance of such an account. The remedy at law which necessitates the submission of such questions to a jury is neither adequate nor as efficient to attain the ends of justice as the remedy in equity, and it cannot bar the latter. Kirby v. Railroad Company, 120 U. S. 130, 132, 134, 7 Sup. Ct. 430, 30 L. Ed. 569; Gunn v. Brinkley Car Works & Mfg. Co., 66 Fed. 382, 384, 13 C. C. A. 529, 531; Fechteler v. Palm Bros. & Co., 133 Fed. 462, 465, 66 C. C. A. 336; Hayden v. Thompson, 71 Fed. 60, 63, 17 C. C. A. 592,

595; Castle Creek Water Co. v. City of Aspen, 146 Fed. 8, 14, 76 C. C. A. 516, 522.

It does not seem to me that the fact to which the majority advert that sections 407, 4051, 4053 and 4054 of the Revised Statutes, require postal revenues and amounts collected for debts due to the Post Office Department and amounts realized from the sales of property of that department to be deposited by the postmaster and the other officers of the department in the Treasury of the United States and make a neglect to do so an offense, is material to the determination of the questions presented in this case.

The general rule of law is that an officer who, without authority or unlawfully, collects moneys from a victim who pays them under protest in order to obtain or preserve his legal rights, is liable to a suit therefor as a private person because he has no lawful power to collect such moneys as an officer and his illegal act is that of himself as a private citizen for which he is personally liable. Elliott v. Swartwout, 10 Pet. 137, 155, 156, 9 L. Ed. 373; Bend v. Hoyt, 13 Pet. 263, 266, 10 L. Ed. 154. So an officer who unlawfully seizes property or infringes a patent is individually liable for the damages he causes, and the fact that he believes that he has lawful authority to do the act as an officer of the United States is no defense. Bates v. Clark, 95 U. S. 204, 208, 209, 24 L. Ed. 471; Belknap v. Schild, 161 U. S. 10, 18, 16 Sup. Ct. 443, 40 L. Ed. 599; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 391, 14 Sup. Ct. 1047, 38 L. Ed. 1014. There is, it is true, an exception to this general rule, and that exception is that where a specific act of Congress requires an officer to pay into the Treasury of the United States money which he unlawfully exacts from his victim or moneys which he secures for unascertained liabilities, and where the officer makes such payments in accordance with this statute, and the statute provides for the repayment to the victims of the amounts unlawfully exacted, the officer is exonerated from liability either as an officer or individually. Cary v. Curtis, 3 How. 236, 240, 11 L. Ed. 576. But the acts of Congress cited by the majority (sections 407, 4051, 4053, 4054, Rev. St.), as I understand them, require the officers and employés of the Post Office Department to pay into the treasury only the moneys they have authority to collect and those they lawfully collect for the United States, and there is no statute that makes it the duty of these officers to pay into the Treasury of the United States their unauthorized or illegal exactions, so that it seems to me that this case falls under the general rule and not under the exception. In my view of the case, the defendants as individuals hold the complainant's money as trustees de son tort to the extent of the amount they illegally exacted from it, and they are liable to account for and to pay these moneys back to the complainant in equity as well as at law.

Finally, the fact that the complainant, which was deprived of all its rights to use the mails during the months of April, June, July, August, September, October, and November, 1907, and of the accounting concerning the return of the amount due it on account of its deposits ever since they were made, succeeded on a new application made in September, 1907, in obtaining a part of its right to use the mails since December 17th in that year, does not appear to me to have waived its

right to the accounting and the adjudication of the amount due it on account of the deposits or to the determination of its right to a cancellation of its bonds. Suppose that a common carrier by railroad compelled a shipper to deposit $20,650 with it for the privilege of transmitting its goods over its railroad at regular rates for nine months on the claim that he ought to pay $20,650 more than the regular rates, and suppose that the carrier then prohibited the shipper from transmitting any of his goods over its railroad at any price for eight months, and the shipper brought suits for an injunction against that prohibition and for an accounting and a return of his deposits. Would the fact that the carrier subsequently permitted the shipper to transmit a portion of new goods he had manufactured and delivered after the suit was brought deprive the shipper of his causes of action for the accounting and for the wrong or render his suit for relief therefrom a moot case? It seems to me that this question should be answered in the negative, and that the complainant's right to the accounting and adjudication of the controversy over the moneys it deposited under protest in order that it might be permitted to exercise its right prior to March, 1907, remains unadjudicated and unaffected by the fact that it succeeded in exercising a part of its right in December, 1907, and thereafter, and that the wrong inflicted upon it by the refusal to permit it to exercise that right according to law from March, 1907, to December, 1907, still remains unredressed and unreleased.

In my judgment the decree below should be reversed, and full relief in equity should be granted to the complainant in this suit.