PORTO RICO RACING CORPORATION, Plaintiff and Appellant, *v.* INSULAR RACING COMMISSION, Defendant and Appellee.

No. 4379. Argued November 18, 1927.—Decided May 31, 1928.

*Félix Córdova Dávila* and *A. Díaz Viera* for the appellant. *Attorney General George C. Butte* and *Guerra Mondragón & Soldevila* for the appellee. *Feliú & La Costa* and *F. Ochoteco* for Las Monjas Racing Corporation, intervenor and appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

On July 29, 1927, the Porto Rico Racing Corporation brought suit for an injunction to restrain the enforcement of an order or rule adopted by the Insular Racing Commission. By this rule petitioner, in order to hold its race-meets, was required to take turns of approximately six months each with a competitor, Las Monjas Racing Corporation.

The Insular Racing Commission answered the petition above mentioned, also another petition for preliminary injunction, and in the same pleading responded to an order to show cause, admitting certain averments, denying others, and insisting upon the right, power and authority under the law of 1927 to adopt and to enforce the rule in question.

At the hearing on the rule to show cause why a preliminary injunction should not issue Las Monjas Racing Corporation appeared and applied for leave to intervene as a party defendant; and, by and with the consent of the original parties, this request was granted. The newly made defendant then demurred upon various grounds which need not be enumerated now. The court overruled the demurrer, directed that the answer of the intervenor be filed, and issued a temporary restraining order pending a hearing of the petition for a preliminary injunction.

On August 15, 1927, after a hearing at which evidence was adduced and after consideration of the briefs submitted by counsel, issuance of the preliminary writ was authorized upon condition that petitioner should furnish a bond in the sum of $10,000 to cover all damages that might be sustained by Las Monjas Racing Corporation as well as by the original defendant in the event of a final and adverse determination of the issues involved.

Two days later the Racing Commission amended its rule so as to provide for alternate turns of three racing days each instead of thirty-three racing days each (approximately six months) and the rule as amended was approved by the Governor on August 22, 1927.

On August 24th a final hearing was had, the preliminary writ previously issued was quashed and the petition for a permanent injunction dismissed with costs to defendants for reasons stated as follows:

"Section 5 of the Racing Act of Porto Rico, name by which Act No. 40 of 1927 is known, reads literally as follows:

" 'The Insular Racing Commission shall have power to prescribe regulations governing races, on the race tracks, and shall be in force, upon the approval by the Governor of Porto Rico, and shall be subject to revision or repeal by the Legislature of Porto Rico.

" 'The Insular Racing Commission shall issue rules to regulate contracts between horse owners and jockeys.'

"A conscientious study of this section of the law, when examined in connection with section 8 thereof, leads us to the conclusion that the Legislature of Porto Rico has made an absolute and complete delegation of all its powers to the Insular Racing Commission, authorizing it to prescribe, without condition or restriction whatsoever, such rules as the Commission may deem necessary and convenient for the holding of races at the race-tracks of Porto Rico, in accordance with, the purpose of the law which is to regulate racing. Such delegation is subject only to two requisites: first, that such regulations shall be approved by the Governor of Porto Rico before going in force; and second, that the Legislature of Porto Rico reserves the right to revise or revoke the regulations adopted by the Racing Commission.

"Plaintiff lays stress on the fact that Act No. 40 is an adaptation or incorporation of Act No. 21 of 1925 in all its provisions, since in the said Act of 1925 there existed a section, that is, section 5, which reads as follows:

" 'The Insular Racing Commission is also empowered to establish turns for race meets where there are two or more race tracks in one municipality.'

"If we notice the word 'also' used in this section we will see that in said Act No. 21 of the Legislature, in addition to the powers given to the Commission by section 4, the Legislature empowered

it to establish turns, such delegation being a clear, manifest and express intention of the law-maker. Now, what was the intention of the Legislature when it repealed Act No. 21 of 1925, in which this section appeared, and enacted in lieu thereof Act No. 40 of 1927, in which no mention is made of the power to establish turns? Was its intention to expressly, manifestly and clearly take away from the Commission the power to establish turns? If such would have been its intention, it would have expressly stated it. If the Legislature did not so do it, that was bcause it believed that this right was included among the general powers to regulate races given to the Racing Commission.

"Regulations are a set of rules promulgated in writing for the government of a given thing. Once such regulations were promulgated and approved by the Governor, the power to revise or to revoke them was reserved by the Legislature and such reservation should be respected by the judicial power.

"We can not take off the historical evolution of section 5 of Act No. 40 of 1927 from the provisions contained in Act No. 21 of 1925. Section 1 of Act No. 40 expressly repeals the whole of Act No. 21 of 1925 and even though for the construction of a statute the court may study other laws in *pari materia,* even though repealed, in order to ascertain the true purpose or intention of the Legislature, when the language of the law is clear and free from all ambiguity, its wording should not be undervalued with the pretext of complying with its spirit.

"If Act No. 40 of 1927 were amendatory of Act No. 21 of 1925 plaintiff's argument would be convincing; but, unfortunately for it, such is not the case. Act No. 40 of 1927, in repealing all previous racing acts, created a new code, without any historical precedents, and to said Act No. 40 we must give the construction and efficiency that a law should have. The said Act No. 40 of 1927 is not even an adaptation of the Act of 1925, because although its purpose was the same, i.e., to create a Racing Commission and regulate horse racing, the new law contains provisions radically and fundamentally different from those of the Act of 1925; and although it is true that the new Act does not empower the Commission to establish turns among the race tracks, it is also true that there is no provision expressly prohibiting it to do so. The powers delegated by the Legislature to the Racing Commission for the regulation of horse racing have no limitation; they are as vast and ample as they could be; and the best proof that the intention of the Legislature was to grant said vast powers to the Racing Commission is

that the Legislature reserved the right to revise and revoke such regulations. An intention more clearly expressed can not be imagined.

"The most efficient and universal method to discover the actual meaning of a law, when its terms are doubtful, is to consider the reason therefor and its spirit, or the cause or motives which induced the legislative power to enact it. The principal purpose of this Act No. 40 is to regulate horse racing. And within its power of regulation the Insular Racing Commission can adopt all such measures as, in its judgment, may be deemed convenient and necessary concerning horse racing, inasmuch as such measures are to be the object of revision or revocation by the Legislature.

"It may be argued that the resolution which is the object of this controversy tends to regulate race tracks rather than horse racing, but a brief study of such resolution convinces us that such is not the case. The amended resolution, which is the only one we need consider, says, in so far as pertinent, that—

" 'Horse racing at the race tracks "Las Monjas Racing Club" and "Quintana Racing Park" shall be held by alternate terms of three consecutive racing days each . . . until otherwise prescribed by the Commission.'

"This is a regulation which governs racing at the race tracks 'Quintana' and 'Las Monjas' and not the race tracks themselves.

"When we are confronted by a legislative intention so remarkably clear and expressed in such precise terms we do not consider it proper for a court of equity to disregard the intention of the lawmaker. Such intention should be the first consideration for a court when construing a law, and the intention here is manifest.

"The cases of Orannan v. Westchester Racing Assn., 153 N. Y. 643; State Racing Commission v. Latonia Agricultural Assn., 35 L.R.A. (N.S.) 905, and Grainger v. Douglas Park Jockey Club, 148 Fed. 513, cited by the parties, discussed questions different from the one here raised, construing provisions of law radically different from ours.

"The Legislature of 1927 was the same that passed the Act of 1925. It knew that the provisions of Act No. 21 of 1925 were repealed by those of Act No. 40 of 1927. If its intention was to limit the ample powers granted to the Racing Commission so that it would have no power to establish turns for the race tracks it should have so specified. If it made no mention of the matter it was because it desired to comprise everything within the general power of regulation subject to its revision or revocation.

"The intention of the Legislature should be respected by this court. It is only in this way that a government established on the basis of the independence of the three powers—legislative, executive and judicial—can harmoniously function.

"The court is of the opinion that the resolution adopted by the Insular Racing Commission for the establishment of turns is not confiscatory, unreasonable or arbitrary, as alleged, but that it falls within the ample exercise of the police power expressly delegated to it by the Legislature of Porto Rico in granting it the power to prescribe regulations to govern the holding of races in the race tracks of Porto Rico. The Commission has power to prescribe rules for the holding of races and for the races themselves."

We can not concur in the conclusion so reached.

The sweeping assertions contained in the extract from the "Statement of the Case and Opinion" filed by the district judge might be met, of course, by equally broad counter statements. Such counter statements could be supplemented in the course of argument by numerous phrases and clauses segregated from their context and taken from various successive enactments in order to justify a contrary conclusion.

There is, however, much room for argument on both sides of the question and a considerable amount of time and labor has been bestowed upon the case by counsel for all parties concerned.

We shall set forth, therefore, enough of the history, growth and development of horse racing in Porto Rico to indicate in a general way the trend of legislation upon that subject. We shall not attempt to include every aspect or detail of such legislation.

The law entitled "An Act to create an Insular Fair Board for the purpose of holding an annual exhibition of agricultural and general productive industries of the Island, and for other purposes," approved March 10, 1910, contained no reference whatever to race tracks, to racing commissions, or to horse racing. Section 6 of that law, as amended three years later, Laws of Porto Rico 1913, page 147, reads in part as follows (italics ours):

"The Insular Fair Board is authorized to contract or lease the race track and the appurtenances thereto in the Insular Fair grounds to any corporation or association duly licensed for conducting races, as hereinafter provided.

"An Insular Racing Commission is hereby established, to consist of three members, to be appointed by the Governor of Porto Rico, who shall serve without compensation.

"Said commission shall have the power to prescribe the rules, regulations *and conditions* under which running races shall be conducted in this Island, and no such races shall be conducted except by a corporation or association duly licensed by said commission, as herein provided; any corporation or association desiring to conduct such racing may annually apply to the Insular Racing Commission for a license so to do. *If in the judgment of the commission a proper case for the issuance of such license is shown,* it *may grant* the same for a term of one year; and every such license shall contain a condition that all races or race meetings conducted thereunder shall be subject to the rules, regulations *and conditions from time to time prescribed* by the commission, and shall be revocable by the commission *for any violation thereof,* or *whenever the continuance of such license shall be deemed by the commission not conducive to the interest of legitimate racing; Provided,* That a refusal of the commission to grant to any racing corporation or association a license, or *to assign a racing corporation or association at least forty days in each year,* if desired for racing by such association, and the decision of such commission revoking any license of any association shall be subject to review of the courts of the Island; and, *Provided, further,* That the corporations or associations that may be registered in the office of the Secretary of Porto Rico for the operation of race tracks shall not require new licenses for the said purpose, notwithstanding said corporations or associations shall be subject to the rules and regulations that may be established by the racing commission which is created by this law.

"Every running race meeting at which racing shall be permitted for any stake, purse or reward, except as allowed by this Act, is hereby declared to be a public nuisance, and every person acting or aiding therein shall be deemed guilty of misdemeanor and punished by a fine of not less than five hundred dollars nor more than one thousand dollars for each day of such meeting or racing, and in addition thereto, in a suit brought for the purpose by the Insular Racing Commission in the court of competent jurisdiction, where

it may be proposed to conduct such unauthorized racing, an injunction may be obtained against the same."

After the lapse of another three years the Insular Legislature in 1916 (Laws of that year, page 94) passed "An Act prohibiting the operation of *bancas alemanas,* pools, or the system known as *pari mutuel,* and bookmaking, without the hippodromes of the Island, and for other purposes."

By the terms of section 1 of this law the business of selling betting slips in the form known as pools, of book-making and of *bancas alemanas,* except as authorized by the provisions of the said act, was prohibited and declared to be unlawful. Section 2 authorized the carrying on of such business only on horse-racing days, in connection with horse racing, and at certain designated places within the hippodromes.

Section 3 provides that no association or corporation shall permit any *bancas alemanas* or *pari mutuel,* or betting at any place within its grounds except that officially designated for the purpose of betting; and that no unauthorized person shall sell or attempt to sell tickets or slips of any kind or form of combination or betting within the hippodromes. Section 4 says that each hippodrome shall provide isolated betting places, subject to the approval of the Racing Commission. Section 5 ordains that no person may sell or supply any slip, ticket, share or interest or other evidence of interest in any pool or combination depending on the result of any horse race or races, except in the places and in the manner permitted by this Act. Section 6 forbids the aiding or abetting of the establishment, direction or playing of pools or *pari mutuel,* or other games, depending on the result of any horse race or races operated in violation of the statute. Section 7 outlaws the maintenance of any office for the preparation or registration of certain tickets, slips or lists, except in the places and manner prescribed. Section 8 authorizes the issuance of search warrants in certain specified circumstances. Section 9 fixes the liability for claims made by

persons betting within the hippodromes at authorized places. Section 10 prohibits the sale to minors of betting slips, or tickets, and the admission of minors to betting places. Section 11 requires that all places where betting slips, in the form specified, are sold shall be subject to inspection by the Racing Commission and by the police.

The Governor is authorized to suspend for just cause and for a period of not longer than fifteen consecutive days any kind of betting or gambling within the places specially designated for that purpose.

Section 12 authorizes the seizure, confiscation and destruction of all paraphernalia by order of the court in certain circumstances. Section 13 provides for the conviction and punishment of any person or persons violating the provisions above outlined.

In the year following section 11, *supra*, was amended by extending the maximum of fifteen consecutive days to a period not to exceed three consecutive months. (Laws of 1917, page 246). At the same time section 13 of the law of 1916 was repealed and sections 13 (*a*) to 13 (*g*), inclusive, were enacted to be inserted in lieu of the section so repealed. Section 13 (*a*) requires the Racing Commission to designate an officer to inspect the operation of the *bancas* and pools on racing days. It is made the duty of this officer, who is to be accompanied by two policemen, to report all violations of the Act to the Insular Racing Commission and, upon the authorization of the Commission, to file complaints in the proper court. He may also exercise such powers as the Racing Commission, in accordance with the law authorizing his appointment, shall confer upon him. Section 13 (*b*) authorizes the appointment by the Racing Commission of judges who, in addition to the duties prescribed by regulations, shall report all violations of the Act to the Racing Commission and upon authorization by such Commission shall file complaints in the proper court, and, as a jury, shall have complete control over the conduct of the races. Section 13 (*c*) makes

it a misdemeanor on the part of any jockey to prevent a horse ridden by him from winning, or to use any drug as a stimulant. It provides penalties for the commission of such offenses and for the instigation thereof. Power is also conferred upon the judges to suspend either temporarily or finally, in accord with the Racing Commission, any jockey or jockeys. Section 13 (*d*) provides for certain deductions from the amount of all bets for the forming of a trust fund for charitable purposes. Section 13 (*e*) specifies the punishment to be inflicted upon persons violating any of the provisions of the Act in question except as provided by section 13 (*c*). Section 13 (*f*) places a ban upon the ownership of horses by certain employees and officials, and disqualifies as racing officials horse-owners, members of a racing association, and members of the Racing Commission. Section 13 (*g*) requires the Racing Commission to hold at least one meeting a month, authorizes special meetings, and provides a *per diem* for the compensation of members attending such meetings.

The Act of 1923 (Laws of that year, page 634) is a combination and re-enactment of the various provisions contained in the laws of 1913, 1916 and 1917, with certain changes and a few minor innovations. Section 4 reads thus (italics ours):

"That an Insular Racing Commission is hereby created, to be composed of five members appointed by the Governor of Porto Rico, by and with the advice and consent of the Senate of Porto Rico, for a term of two years. The office of member of the Insular Racing Commission is hereby declared incompatible with any public office paid by the Insular Government or by the Government of the United States. Said Commission shall have power to prescribe such rules *and conditions* as shall govern horse-racing in Porto Rico. Any natural or artificial person desiring to hold races shall apply to the Insular Racing Commission for a proper license. *If in the judgment of the commission the issuing of said license is warranted,* it *may issue* the same *for the term of one year,* but all licenses shall contain the condition that all races held thereunder shall be governed by such rules and *conditions* as the commission *may from time to time prescribe.* The aforesaid license shall be revocable *for just cause* by the Insular Racing Commission.

"The Insular Racing Commission shall appoint three judges whose duty it shall be to see that such rules as may be prescribed by the commission for the operation of races are complied with, and the rulings of said judges shall be appealable only to the Insular Racing Commission except as regards the start and finish of each race. In addition to said three judges the Insular Racing Commission *shall appoint for each hippodrome where races are held* the following officials: one clerk to the judges; one paddock judge; three track patrolmen; one weigher, and one time keeper. The Insular Racing Commission, *on recommendation of the directors thereof, shall appoint for each race-track one starter and one assistant starter.* The Insular Racing Commission shall render an annual report to the Executive Secretary on the result of all its work during the year.

"Each judge shall receive·a *per diem* of twenty (20) dollars for each day on which races are held, payable out of the funds of the Insular Racing Commission. In all matters to be decided by said judges as a body, the decision of the majority shall be conclusive, it being understood that the corporation or person exploiting the race-track business, as well as the owners of horses or other interests, shall be subject to said decisions.

"The decision of the Insular Racing Commission shall be binding on all natural or artificial persons operating a race-track business; *Provided,* That no by-laws for the government of such race-tracks shall be valid unless duly approved by the Insular Racing Commission.

"All race meets where races are allowed for any stake, purse or other compensation, except as herein provided, are hereby declared to be a public nuisance, and any person taking part or coöperating therein shall be deemed guilty of misdemeanor, and shall be punished by a fine of not less than five hundred (500) nor more than one thousand (1,000) dollars for each day of such meet or race. In addition, where it is purposed to hold such unauthorized races, in such complaint as may be filed for the purposes of the Insular Racing Commission in a court of competent jurisdiction, an injunction may be obtained to prevent them."

Section 16 provides that "for just cause the Insular Racing Commission may at any time suspend bets at the pools, *bancas alemanas,* or *pari mutuel* at the places specially designated for such purposes within any hippodrome in Porto

Rico, and may also for just cause revoke the license issued to any natural or artificial person for the exploitation of horse races, but such suspension shall in no case be of longer duration than three consecutive months.''

Section 20 classifies race horses as imported thoroughbreds and native horses. It eliminates competition between the two groups and requires the inclusion of at least three races for native horses in every racing program.

Section 21 requires the Racing Commission to keep studbooks and to license horses registered therein upon payment of a prescribed fee and upon compliance with the regulations. It also makes it the duty of every jockey, horse owner, or owner of a stable, to provide himself with a similar license. The third and fourth paragraphs define certain offenses and prescribe penalties.

Section 22 refers to the disposition that shall be made of the proceeds accruing from the collection of fines and the issuance of licenses. By the terms of section 23 the Treasurer of Porto Rico is directed to see to the enforcement of the legislative provisions in regard to the distribution of the funds derived from the deduction on bets referred to in previous sections, and to this end he may require the Insular Racing Commission to produce its books, records and such other documents as may be necessary. Section 25 allows each member of the commission a *per diem* of twenty dollars ($20).

In 1925 (Laws of that year, page 146) the twenty-eight sections of the law of 1923 are expanded into fifty-five, but the ground covered by the two enactments is substantially the same. Among the new features we note the following:

Section 26 says that the Racing Commission may refuse to register the name of any new horse in the stud-book in a number of specified cases. Section 29 demands that the Insular Racing Commission shall brand with a red-hot iron every colt registered within one hundred and eighty days after its birth. It also prescribes in detail the maximum size

and number of the letters or figures to be used in branding, the manner in which the branding is to be done and the penalty to be paid by any horse owner who declines to permit such branding.

Section 30 provides that licenses issued by the Insular Racing Commission shall oblige race-track owners to allow the horses referred to in said licenses to run at such meets as may be held. Section 40 forbids the checking or registering of blank pool tickets, except in certain specified cases.

Section 42 bars the selling of tickets or any form of combination or bet within the hippodrome enclosure by any person not duly authorized.

Section 51 authorizes the withholding of odd cents in the payment of money to winners. Section 21 relates to certain judicial remedies.

In order to facilitate comparison, sections 2 to 12 inclusive, together with sub-titles, are here set forth in full (italics ours):

"INSULAR RACING COMMISSION

"Section 2.—There is hereby created an Insular Racing Commission to be composed of five members appointed by the Governor of Porto Rico, with the advice and consent of the Senate of Porto Rico, for a term of two years. In addition to the said five members of the Insular Racing Commission there shall be two members who shall have a voice but no vote; one of them shall represent *the hippodromes in operation in Porto Rico* and shall be designated by the natural or artificial person or persons owning said hippodromes, and the other shall represent such associations of race-horse owners as are duly registered in the office of the Executive Secretary of Porto Rico. For said purpose the secretaries of the *different corporations operating race-tracks* and of the aforesaid associations of race-horse owners, when the Insular Racing Commission shall have been organized, shall certify thereto the names of such persons as may have been designated by their respective corporations or associations to represent them before the Commission. The designation of such representatives shall be for an indefinite term and until the association or corporation appointing them decides to remove them, or until they resign. The office of member of

the Insular Racing Commission is hereby declared incompatible with any other remunerative public office under the Insular or Municipal Government, or that of the United States.

"Section 3.—The Insular Racing Commission shall hold at least two meetings a week and such special meetings as may be necessary, and each of the five members of the Insular Racing Commission, appointed by the Governor with the advice and consent of the Senate of Porto Rico, shall receive a *per diem* of fifteen (15) dollars for each meeting attended by him, but in no case shall any of said members receive more than one hundred and fifty (150) dollars in any month by way of *per diems*. Said *per diems* shall be paid out of the funds of the Insular Racing Commission.

## "Powers of Insular Racing Commission

"Section 4.—The Insular Racing Commission shall have power to prescribe rules and *conditions* governing races in Porto Rico, *including all such matters as relate to the form in which bets shall be made in the 'bancas alemanas' and pools, and as relate to the registration of horses in the stud-book.*

"*The Insular Racing Commission is further empowered to prescribe such correctives as it may deem advisable for violations of its horse-racing regulations.*

"The regulations of the Insular Racing Commission shall be approved by the Governor of Porto Rico, and when he has approved them they shall be compulsory.

"As far as possible, the Insular Racing Commission shall follow, in its investigations and proceedings, the procedure established by law for the conduct and dispatch of business in the courts of justice.

"Section 5.—*The Insular Racing Commission is also empowered to establish turns for race meets where there are two or more race-tracks in one municipality.*

"Section 6.—The members of the Insular Racing Commission are hereby empowered to administer oaths in all cases or matters in connection with the enforcement of this Act and of the Commission's regulations.

## "Appointment of Racing Officials and Employees of the Insular Racing Commission

"Section 7.—*On recommendation of the directors thereof,* the Insular Racing Commission shall appoint the following officials *for each race-track:* three judges, who shall constitute the board of

judges *at each track;* one starter and one assistant starter; one weigher; one clerk to the judges; one paddock judge and one assistant paddock judge; four track patrolmen; one timekeeper; one fine collector; one entry clerk; one assistant flagman; one veterinarian; one inspector of mountings; pool and *banca* inspectors; one jockey instructor, *and all such other officials as it may deem neccessary for the better operation of the races,* and shall assign to each such salary or *per diem* as it may deem reasonable. And it shall appoint a secretary to the Commission and such other office employees as it may deem necessary, and shall fix their salaries; *Provided,* That no salary shall exceed one hundred and fifty dollars a month, except that of the starter who shall not receive over seventy-five dollars for each day of racing. All said salaries and *per diems* shall be paid out of the funds of the Insular Racing Commission hereinafter created.

"Granting of Licenses and Payment Therefor

"Section 8.—Every natural or artificial person desiring to hold races shall apply to the Insular Racing Commission for the proper license. *When such person shall have complied with the requisites established by regulation* by the Commission, the latter *shall grant* a license *for a term of one year* upon the payment of three hundred (300) dollars. Every license shall contain the condition that all races held thereunder shall be subject to the rules *prescribed* by the Commission.

"Section 9.—Every horse owner, or owner of a stable, shall be provided with a license issued by the Insular Racing Commission upon the payment of a fee of twenty (20) dollars a year and upon complying with such requisites as the Commission may by regulation prescribe.

"Section 10.—All jockeys shall be provided with a license issued by the Commission upon payment of a fee of ten (10) dollars a year and upon complying with such requisites as the Insular Racing Commission may by regulation prescribe.

"Section 11.—Every stableman or trainer shall be provided with a license issued by the Commission upon payment of a fee of two (2) dollars a year and upon complying with such requisites as the Commission may by regulation prescribe.

"Revocation or Temporary Suspension of Licenses

"Section 12.—The Insular Racing Commission may, *for just cause and after hearing the party and granting an opportunity for*

*defense,* temporarily suspend or revoke the license of any race-track, horse owner, jockey or stableman."

The law of 1925 is entitled (italics ours): "An Act to repeal Act No. 86, approved August 11, 1923; to create an Insular Racing Commission *with powers to regulate races* and to impose certain penalties for violations of its regulations; to prohibit the operation of *bancas alemanas,* pools, book-making or the system known as the *pari mutuel,* except in such form and in such places as allowed by this Act, and for other purposes."

The Racing Act of 1927 is entitled (italics ours): "An Act to repeal Act No. 21 of June 7, 1925," identifying it, "and to create an Insular Racing Commission, *to regulate the racing sport,* and for other purposes."

By the terms of section 3 of this Act, under the title "Insular Racing Commission," that institution is reduced from an organization of seven members to the original membership prescribed by the Law of 1913 and is now composed of "a Commissioner of Insular Racing Service, who shall be Chairman of said Commission, and two associate Commissioners."

Section 4 provides for one regular meeting a week and such special meetings as may be deemed necessary instead of "two meetings a week and such special meetings as may be necessary," as prescribed by the law of 1925.

Sections 5 and 6 under the title "Powers of the Insular Racing Commission," section 7, "Appointment of Officials," section 8, taken from the sub-title "Granting of licenses and payment thereof," and section 12 entitled "Revocation or temporary suspension of licenses," now read as follows (italics ours):

"Section 5.—The Insular Racing Commission shall have power to prescribe regulations governing races on the race-tracks, and shall be in force, upon the approval of the Governor of Porto Rico, and shall be subject to revision or repeal by the Legislature of Porto Rico.

"The Insular Racing Commission shall issue rules to regulate contracts between horse owners and jockeys.

"Section 6.—The Insular Racing Commission shall have power to impose correctives and punishments for violations of its regulations governing horse races, and its decisions shall be unappealable, and there shall be no judicial recourse, either regular or extraordinary, except when it refers to the permanent expulsion or the temporary suspension for a period of three or more months, of the horses, their owners, jockeys, trainers, stableman or any of them, in which case the prejudiced parties may appeal to the courts of justice; but such appeal shall not have the effect of a *supersedeas*, except when it deals with the permanent expulsion, and in this case only when the court issues a writ of *supersedeas* under bond. *Appeals in these cases shall follow the same proceeding as fixed by law for appeals from the decisions of municipal to district courts, which shall have authority to try said appeal, their decisions being final and unappealable.*

"*The Insular Racing Commission shall, whenever possible, follow in its investigations and proceedings, the procedure. established by law for the conduct and dispatch of business in the courts of justice.* The Insular Racing Commission is hereby empowered to administer oaths in all cases or matters in connection with the enforcement of this Act and of the Commission's regulations. The executive meetings of the Commission shall be private, but the *hearings granted to the parties shall be public.*

"Section 7.—The Insular Racing Commission *shall appoint for each race track in operation, on the proposal of the directors thereof,* the following officials: three judges who shall form the jury, the chairman being elected by the jury from among its members; three substitute judges; a secretary to the jury; two judges for the pools and *bancas;* an instructor of jockeys; four track judges; a collector of fines and a time-keeper.

"Besides, it shall appoint a secretary to the Commission, and all other employees that it may deem necessary for its office, assigning to all of them the salary or *per diem* that it may deem reasonable; *Provided,* That no salary or *per diem* shall exceed one hundred and fifty (150) dollars monthly and all these salaries and *per diems* shall be paid out of the funds of the Racing Commission, hereinafter created by this Act.

"*The directors of every race track* shall be compelled to appoint a starter and an assistant starter, one weigher, an assistant weigher, one paddock judge and one assistant paddock judge, one timer, one

registration judge, two assistant flagmen, a veterinary, a physician and an inspector of 'mountings. After having made these appointments the directors of the race track shall report to the Racing Commission the names of the persons appointed for these offices, *and their salaries shall be paid by the said directors:* Provided, *That the Insular Racing Commission can not appoint or direct the corporation to appoint for the race track other employees in addition to those determined by this Act.*

"The Insular Racing Commission may remove any race-track official appointed by the Commission or by the corporation, *for inefficiency, negligence in the discharge of his duties or misconduct in the discharge of his office, furnishing him, a copy of the charges preferred against him, and affording him an opportunity to be heard in' person or by counsel, in his own defense, within ten days following the service of the charges.*

"Section 8.—Every natural or artificial person desiring to hold races shall apply to the Insular Racing Commission for the proper license. *When such person shall have complied with the requisites prescribed by the regulations of the Commission, the latter shall grant* the license upon the payment of three hundred (300) dollars *annually.* The licenses shall contain the conditions that all races held thereunder shall be subject to the rules *prescribed* by the Commission.

"Section 12.—The Insular Racing Commission may, *for just cause and after hearing the parties and granting them, an opportunity for their defense,* temporarily suspend or revoke the license of any race track, horse owner, jockey or stableman; *Provided, That any resolution of the Insular Racing Commission cancelling the license of any race track, shall be appealable to the district court wherein the race track is located;* the appeal shall not suspend the effect of the resolution appealed from unless the district court appealed to issues a writ of *supersedeas* upon furnishing of bond. *The procedure followed in this appeal* shall be the same as that followed at the present time in cases of appeals from the municipal to the district courts, and the decisions rendered in these cases by the district courts shall be final and unappealable. The race tracks may make their by-laws subject to the approval of the Insular Racing Commission."

The Act of 1927 is essentially a rearrangement, restatement and reenactment of the fifty-five provisions of the Act of 1925. An exhaustive exposition of this aspect of the case

may be found in the discussion by counsel for appellant of a proposition submitted under the third assignment, pages 14 to 26 of the brief.

Only three sections of the law of 1925 are omitted in the reenactment of 1927. Of these by far the most significant, as well as the only, omission with which we are now concerned is that of section 5 of the previous law which expressly authorized the establishment of turns by the Insular Racing Commission.

Of the modifications involved the most important and the most outstanding as the probable reason and only rational justification of the revision in question are those indicated by the reference already made to sections 3 to 12, inclusive, of the later law.

In the successive legislative enactments above mentioned two parallel tendencies are more or less distinctly discernible. The first, and perhaps the more obvious of the two, is an ever increasing disposition directly to control and to regulate in detail the business of horse racing by specific statutory provisions covering every aspect of that business. The second and concomitant phase of this general drift in legislative policy is an apparent inclination to curtail the powers of the Insular Racing Commission.

The salient features of the amendment of 1913 are, first, the total absence of any attempt directly to control or to regulate horse racing, and, second, the practically unlimited scope of the powers conferred upon the Insular Racing Commission as originally created. The gradual but steady development of a different policy on the part of the Legislature, especially in the matter of direct regulation and control, if not already apparent, may be readily traced in the successive legislative enactments. It will suffice, therefore, to point out somewhat more specifically the particular thread upon which, as it runs through the history of the Insular Racing Commission, the nature and scope of the powers conferred upon that body primarily depend.

The authority conferred upon the Racing Commission at the time of its creation to grant a license "if in the judgment of the Commission a proper case for the issuance of such license is shown," and to revoke the same "for any violation thereof, or whenever the continuance of such license shall be deemed by the Commission not conducive to the interest of legitimate racing," was substantially equivalent to and coextensive with the broad powers discussed by the New York court in *People* v. *State Racing Commission*, 103 N. Y. S. 955, as shown by the following extract:

"While the question considered and decided by the court in the *Grannan Case* was not such as to bring before the court for decision directly the question whether or not the power of the commission to grant or refuse a license to an association having the statutory qualifications is one resting absolutely in the discretion of the commission yet the reasoning of the opinion indicates the view, at least of the writer, if not of the entire court, that such discretion is absolute, and not limited merely to a determination of the existence of such qualifications. The language used in section 6, c. 570, p. 373, Laws 1895, conferring the power to grant a license, is apt to make its exercise purely discretionary with the commission. The language used is not: 'If a proper case for the issuance of such license is shown, it may grant such license,' but it is: 'If, in the judgment of such commission, a proper case for the issuance of such license is shown, it may grant such license.'

"This view of the absolute discretion of the commission receives confirmation from the provisions of section 7 of the act as to the revocation of a license. There express power is given to the commission to revoke a license 'if for any other reason the continuance of such license shall not be deemed conducive to the interests of legitimate racing.' The term 'legitimate' here is evidently used in its broad, not technical, sense, and means 'good' or 'proper', and not merely unlawful. The deeming—i. e., the conclusion—is made to be that of the commission in the exercise of its untrammeled discretion. Counsel upon both sides seem to be agreed in this construction of the provisions conferring the power of revocation. It would be a strange thing, indeed, if the commission were compelled to grant a license to an association simply because such association was formally duly organized and had provided a race track of the

statutory dimensions, and then at once thereafter, upon complaint of the Jockey Club, the commission could revoke the license simply because it thought that the continuance of the license would not be conducive to the interests of legitimate racing.' I think that the expression, 'in the judgment of such commission,' in section 6 of the act, in the provision as to granting a license, implies a discretion as absolute to grant or refuse an application for a license as do the provisions in section 7 express an absolute discretion to revoke.''

The provision that the Racing Commission might prescribe "rules, regulations and conditions," the provision that all races conducted under any license should be subject to "rules, regulations and conditions from time to time prescribed by the commission," and the provision that a refusal "to assign a racing corporation or association at least forty days in each year" should be subject to review by the courts, were quite similar to those of the Kentucky statute construed by a Federal Circuit Court of Appeals in *Grainger* v. *Douglas Park Jockey Club,* 148 Fed. Rep. 514. From the opinion in the case last mentioned we take the following extract (italics ours):

"It would seem that *the commission has power, not only to grant licenses, but that it has power also to assign and fix the dates at which the races shall be run under the license,* which two powers need not be exercised simultaneously, but may be exercised successively, in which case, however, the power to assign and fix dates shall be exercised subsequent to the exercise of the power to grant the license. *There is no express provision to this effect.* If it has such power it is to be implied from the proviso of section 3, the second of the two court review clauses which the act for some reason contains, whereby it is provided that, not only the refusal of the commission to grant a license or its revoking a license shall be subject to the review of the courts of the state, but also that a refusal to assign any racing association at least 40 days in each year if desired for racing by such association shall be subject to like review. If the act is construed as conferring such power in addition to the power of granting licenses, then, of course, the act prohibits the running of races by an association having a license at any other time than the dates assigned by the commission.

\*        \*        \*        \*        \*        \*        \*

"Apart from the power to prescribe the rules, regulations, and conditions under which running races shall be conducted, . . . it confers on it the power to grant and to revoke licenses and to assign and fix dates at which race meetings under the licenses may be held. It is true that no express power is conferred to assign or fix dates unless it is included in the power to prescribe such rules, regulations, and conditions, as to which we have grave doubt. But we think it is to be implied from the second court review provision contained in the proviso of section 3, which provides that a refusal to assign dates for at least 40 days in each year shall be subject to court review, and the commission from the form of license adopted by it seems to have so construed the act.

"The power to grant licenses is to be exercised when 'in the judgment of the commission a proper case for issuance of' a license is shown. The power to revoke a license is to be exercised upon 'any violation' of the rules, regulations, and conditions prescribed by the commission, or 'whenever the continuance' of the license 'shall be deemed by the commission not conducive to the interests of legitimate racing'."

If the law as amended in 1913 had remained unchanged, perhaps the present controversy would not have arisen. Since 1923, however, a license issued by the Insular Racing Commission is not, in terms at least, revocable for violation of "such rules and conditions as the commission may from time to time prescribe," or "whenever the continuance of such license shall be deemed by the commission not conducive to the interest of legitimate racing," but only "for just cause." Whether or not the violation of the condition specified in the license, or prejudice to the interest of legitimate racing, may amount to "just cause," in a particular case, is another question.

In the Act of 1923 there is no reference to a possible refusal on the part of the commission "to assign a racing corporation or association at least forty days in each year, if desired for racing, by such association." On the contrary the Racing Commission is expressly required to appoint a number of specified officials "for each hippodrome where races are held." Here the previously contemplated possibil-

ity of an assignment of dates or the fixing of turns by the Racing Commission for the holding of races, and an implied authority in this regard, is substituted by a plain provision for the appointment of as many different sets of judges and other racing officials as there are race tracks in simultaneous operation.

The suggestion of such simultaneous operation does not necessarily exclude the possibility of establishing turns if elsewhere authorized. Also, it is quite conceivable that the thought uppermost in the mind of the Legislature in 1923 was the elimination of a review by the courts, of the refusal to grant a license or of a cancellation thereof rather than the repeal of any implied authority as to the establishment of alternate turns. Nevertheless, the fact remains that the only clause from which such authority might be fairly and satisfactorily inferred was omitted. Neither the district court nor this court has any power to supply such an omission, whether inadvertent or otherwise.

The law of 1925 practically says that the term "races" (*la celebración de carreras*) shall include "all such matters as relate to the form in which bets shall be made in the *bancas alemanas* and pools, and as relate to the registration of horses in the stud-books." It does not say that the word "races" shall likewise include all matters relating to turns or to dates upon which races are to be run upon the various tracks operated by competing owners. Nevertheless, the Legislature in 1925 proceeded upon the theory that the "power to prescribe rules and conditions governing races" did not include the power "to establish turns for race meets." Otherwise, it must be deemed deliberately to have done a vain and useless thing in providing as it did provide by the terms of a new and independent section of the law that—

"Section 5.—The Insular Racing Commission is also empowered to establish turns for race meets where there are two or more race-tracks in one municipality."

Here it was the plain purpose of the Legislature to give the Racing Commission a free hand in matters relating to betting at the race track and to the registration of horses in the stud-book, in so far as the subject matter should prove to be inadequately covered by reenactment of the various laws hereinabove mentioned. It is equally clear that the Legislature here intended also to restore the power implied in the provision as to the refusal to assign "a racing corporation or association at least 40 days in each year," contained in the amendment of 1913 and omitted from the law of 1923. Moreover, the commission is further empowered to prescribe correctives for the violation of its regulations. The members of the commission are authorized to administer oaths, but the commission must "follow, in its investigations and proceedings, the procedure established by law for the conduct and dispatch of business in the courts of justice."

On the other hand, under separate headings, after providing for the "appointment of racing officials and employees of the Insular Racing Commission," the Legislature in 1925 deals independently with the question of "granting of licenses and payment therefor," and with the corollated subject, "Revocation or temporary suspension of licenses." Under the law of 1925 the granting of a license does not depend upon whether or not *in the judgment of the commission a proper case for the issuance of such license is shown.*" The law of 1925 does not say that the commission *"may grant"* a license for the term of one year, nor that such license must "contain a condition that all races held thereunder shall be governed by such rules and conditions as the commission *may from time to time prescribe."* The language of the statute has ceased to be permissive and directory. It is positive and mandatory. When an applicant "shall have *complied with the requisites established by regulation by the commission,* the latter *shall grant a license for a term of one year upon the payment* of three hundred (300) dollars." The condition to be contained in the license is not, as in 1923,

"that all races held thereunder shall be governed by such rules and conditions as the commission *may from time to time prescribe,*" but the condition now is "that all races held thereunder shall be subject to the rules *prescribed by the commission.*"

A hearing and an opportunity for defense is no longer to be implied from the requirement as to "just cause." It is expressly made an indispensable prerequisite to the temporary suspension as well as to the revocation of a license. .

Section 5 of the law of 1927 contains a gentle reminder, manifestly superfluous save by way of admonition, that the regulations adopted by the commission are at all times subject to revision or repeal by the Legislature. Section 6 makes the decisions of the commission in the matter of correctives and punishments for violations of its regulations unappealable, except when such decisions involve "the permanent expulsion or temporary suspension for a period of three or more months of the horses, their owners, jockeys, trainers, stableman or any of them." The interesting feature is a provision for an appeal and for a trial *de novo* in the district court in all cases coming within the exception last mentioned. A like remedy is again expressly established by the proviso attached to section 12, *supra.* The general result is not the exemption of the commission from all judicial interference. Where important personal rights or valuable property rights are involved the law practically places the commission created by it under the direct supervision and control of the district court. In all such cases the decision of the district court is made final. Our only regret is that the decision, either of the commission or of the district court, was not made final in every instance.

Section 6 also provides that "the executive meetings of the commission shall be private, but the hearings granted to the parties shall be public." Thus, even in the case of investigations wherein the aggrieved party may be cut off from his remedy by appeal from an adverse decision, the

sunlight of publicity is thrown upon the proceedings of the commission.

Section 7 provides for the appointment by the directors of the racing corporation of certain race-track officials formerly named by the commission. Instead of the former provision for appointment by the Racing Commission of "all such other officials as it may deem necessary for the better operation of the races," we find the following proviso: "That the Insular Racing Commission can not appoint, or direct the corporation to appoint, for the race-track, other employees in addition to those determined by this Act." The Insular Racing Commission is now permitted to remove any race-track official appointed by it or by a racing association, but only "for inefficiency, negligence in the discharge of his duties or misconduct in the discharge of his office," and after "furnishing him a copy of the charges preferred against him, and affording him an opportunity to be heard in person or by counsel, in his own defense, within ten days following the service of the charges."

Section 5 of the law of 1925 is conspicuous by its absence in the law of 1927.

"Where a statute is revised, some parts of the original act being omitted, the parts which are omitted cannot be revived by construction, but are to be considered as annulled, provided it clearly appears to have been the intention of the legislature to cover the whole subject by the revision." 36 Cyc. 1080 and 1081.

In *Pirie* v. *Chicago Title & Trust Co.*, 182 U. S. 438, the Supreme Court of the United States, speaking through Mr. Justice McKenna and referring to a situation somewhat similar to the one now under consideration, said:

"Was the omission without purpose? The omission of a condition is certainly not the same thing as the expression of a condition. Was it left out in words to be put back by construction? Taken from the certainty given by prior use and prior decisions and committed to doubt and controversy? There is a presumption against it. When the purpose of a prior law is continued usually

its words are, and an omission of the words implied an omission of the purpose. This rule we lately applied in *Bardes* v. *First National Bank of Hawarden,* 178 U. S. 524. In that case, in determining whether the jurisdiction of the Circuit and District Courts of the United States was concurrent with the state courts in certain suits at law and equity between the assignee in bankruptcy and the adverse claimant of property of the bankrupt, the statutes of 1841 and 1867 were compared with that of 1898, and from the omission from the latter of certain provisions of the former statutes it was decided that such jurisdiction did not exist. It was said by the court, speaking by Mr. Justice Gray: 'We find it impossible to infer that when Congress, in framing the act of 1898, entirely omitted any similar provision, and substituted the restricted provisions of section 23, it intended that either of those courts should retain the jurisdiction which it had under the obsolete provision of the earlier acts'.''

In a note to *Sumption* v. *Rogers,* Ann. Cas. 1915 B, page 622, numerous British and American cases are cited in support of the proposition that—

"Where the meaning of a statute is doubtful, it is well settled that a previous statute dealing with the same subject, which has expired or been repealed, may be resorted to for the purpose of resolving this doubt."

*Lockwood* v. *District of Columbia,* 24 App. Cas. (D. C.) 569, is mentioned by the editor as "apparently the only case which does not sustain the foregoing view."

*Converse* v. *U. S.,* 21 How. 463, and two state cases are also cited as holding that—

"A series of acts on the same subject may be compared in order to discover the policy of the legislature in regard to that subject."

Another group of state and federal cases is given as authority for the statement that—

"Where a part of a statute has been repealed that part may be used to explain the provisions of the part retained."

It is equally true, of course, as pointed out in the same note, that—

"Where a statute is clear on its face, and, when standing alone, is fairly susceptible of but one construction, the courts will adopt that construction and refuse to consider prior statutes on the same subject."

In the case at bar, however, for the same or similar reasons which impelled the Federal Circuit Court to express grave doubt as to the scope and effect of a like provision in the Kentucky statute construed in *Grainger* v. *Douglas Park Jockey Club, supra,* we can not concur in the view that section 5 of the law of 1927 "is clear on its face, and, when standing alone, is fairly susceptible of but one construction."

For the purpose of this opinion it may be conceded that, in a proper case, the power to regulate might and should be regarded as including the power to license. In the statute now under consideration, however, the power to license is separately defined and directly regulated and controlled under a different and independent heading by other sections of the same law. It may be, as contended by counsel for the intervenor in connection with another aspect of the instant case, that the logical effect or practical result of the regulation establishing alternate turns was temporarily to suspend from time to time the license previously issued to petitioner. But it does not follow that the act of the Racing Commission herein complained of amounted to a temporary suspension of such license "for just cause and after hearing the parties and granting them an opportunity for their defense," within the meaning of section 12 of the law. Nor has it occurred to any of the parties concerned, apparently, that any implied authority for the fixing of alternate turns by the commission can be found in section 8.

We need not speculate, therefore, as to how far the construction of section 5 might have been affected by a failure on the part of the Legislature elsewhere to cover the subject of licenses, including the power to grant, to suspend and to revoke the same.

Moreover, in the case at bar, we have the contemporary construction already placed by the Legislature itself upon section 4 of the law of 1925, which is the immediate prototype of section 5 of the Act of 1927. Manifestly, in 1925 the Legislature did not regard a grant of "power to prescribe rules and conditions governing races in Porto Rico" as adequate to confer upon the Racing Commission the authority to establish alternate turns. In the circumstances we are unwilling to impute to the framers of both laws upon the reenactment of section 4 of the law of 1925 as section 5 of the law of 1927 an intention to use the word "regulations" as having a broader meaning and significance than the words "rules and conditions," already construed as aforesaid.

If, in addition to the immediately foregoing consideration, section 5 of the law of 1927 be examined in the light of its history, as hereinabove outlined, culminating in the omission from the revision of 1927 of section 5 contained in the law of 1925, the conclusion that the Legislature in 1927 did not intend by mere implication to confer upon the Insular Racing Commission the same power and authority previously made the subject of an express grant, becomes inevitable.

Motions to dismiss the present appeal were filed by the defendant commission and by intervenor. These motions were heard and taken under advisement at the time the case was argued and submitted on the merits. The ground relied upon in each instance is that the question involved in the instant case has become academic by reason of the fact that the license issued to petitioner under the law of 1925 expired on September 14, 1927, two days after the notice of appeal herein was filed. We are inclined to agree with counsel for appellant that the case at bar can and should be distinguished from *Lewis Pub. Co.* v. *Wyman,* 182 Fed. 13; *Yent* v. *State,* 49 L.R.A. (N. S.) 1204, and others, cited by counsel for the intervenor, upon the principle announced by the Supreme Court of the United States in *Boise City Irr. & Land Co.* v. *Clark,* 131 Fed. Rep. 415, and in *Southern Pacific Terminal*

*Co.* v. *Interstate Commerce Commission and Young*, 219 U. S. Rep. 514. In any event, the instant case can hardly be regarded as moot, in view of the pronouncement as to costs, the assignment of error in this regard and the two bonds furnished by petitioner in order to obtain the temporary restraining order and the preliminary injunction in the court below.

A more serious question was raised by the demurrer on the part of intervenor in the court below and has been renewed by counsel for intervenor on the present appeal. The contention is that neither the license issued to petitioner on September 14, 1926, nor any right of petitioner thereunder survived the repeal of the law of 1925 by the Act of 1927, which took effect on May 4, 1927, more than two months before the adoption by the Insular Racing Commission of the rule which gave rise to the present controversy. There is no doubt about the general trend of the law upon this subject. The only question to be considered in this connection is whether or not the facts in the instant case bring it within an exception to the general rule rather than within the rule itself. The rule referred to and the only exception thereto that seems to have been recognized in any decided case are set forth in 37 C. J. 214, as follows:

"All the privileges permitted by the license, and all the protection given thereby, although yet unexpired, are generally canceled and revoked by the repeal of the law which authorized its grant, *unless the license, although obtained under the repealed law, is such a license as is required by the new law.*"

We do not have access to the solitary case cited by the text in support of the exception; but the exception seems to be reasonable, and the facts in the case at bar bring it well within the exception.

Another suggestion is that petitioner had a plain, adequate and complete remedy at law. The remedy referred to is the provision for an appeal from "any resolution of the Insular Racing Commission canceling the license of any race-track,"

contained in section 12 of the Racing Act. Counsel concede the existence of a doubt as to whether or not an appeal would lie from an order of temporary suspension. It is even more doubtful whether or not a district court would be disposed to issue a writ of *supersedeas* on appeal from an order of temporary suspension. It is only fair to assume in favor of petitioner that the district judge might be influenced to some extent by the distinction drawn between ''temporary suspension for a period of three or more months'' and ''permanent expulsion,'' in section 6, *supra*. In any event, a more serious and fundamental question would still remain as to whether or not the mere fixing of turns should be regarded not only as a temporary suspension of the license in question but also as a cancellation, or partial cancellation of such license ''for just cause,'' within the meaning of that term as used in section 12.

''It is a settled principle of equity jurisprudence that, if the remedy at law be doubtful, a court of equity will not decline cognizance of the suit . . . Where equity can give relief, plaintiff ought not to be compelled to speculate upon the chance of his obtaining relief at law.'' *Davis* v. *Wakelle*, 156 U.S. 680, 688.

Counsel for intervenor also submits that petitioner has lost whatever right it may have had to a permanent injunction by applying for and obtaining a new license issued under the new rule shortly after the judgment of dismissal in the court below. The application for a new license expressly disavowed any intention on the part of the applicant to acknowledge the validity of the rule fixing turns, and specifically reserved the right to challenge and to test the validity of such rule either by prosecution of the present appeal or by subsequent suits.

Counsel insist, however, that petitioner, after obtaining and accepting a license issued in accordance with existing regulations and expressly conditioned upon a compliance therewith, can not consistently invoke the aid of a court of equity. Whether or not the condition embodied in the license

to the effect that "all races held thereunder shall be subject to the rules prescribed by the Commission" contemplates only reasonable and valid rules, thereby excluding unreasonable and *ultra vires* requirements, is not discussed in the briefs.

So much of the argument as proceeds upon the theory of a change in the situation, as affecting the discretion or power of this court to issue a permanent writ at this time, is somewhat more persuasive. There is no adequate development of the question in the briefs, and we shall not undertake at this time an independent investigation of the merits. But for the element of costs, and the consequent necessity of reviewing matters discussed and disposed of by the court below, we might have come to a different conclusion upon the point raised by the motions to dismiss the present appeal. We are not now concerned with the intrinsic merits of questions arising after the judgment appealed from, but not considered by the court below, nor in any way affecting the result on appeal so far as a mere affirmance or reversal is concerned.

Whether a reversal should be accompanied by the issuance of a permanent writ, or whether the case should be remanded for further proceedings not inconsistent herewith, is another matter. Upon this point, all things considered, we are disposed to give intervenor the benefit of a very serious doubt.

The judgment appealed from must be reversed.

Mr. Justice Texidor took no part in the decision of this case.